*State of Maryland v. Latoya Bonte Elzey*, No. 3, September Term, 2020.
Opinion by Biran, J.


**CRIMINAL LAW – SELF-DEFENSE – BATTERED SPOUSE SYNDROME – JURY INSTRUCTION –** Respondent was charged with the murder of her boyfriend. At trial, Respondent's expert witness testified that Respondent suffered from Battered Spouse Syndrome at the time of the alleged murder, as a result of her history of abusive relationships, which included her relationship with the victim and her relationships with two prior intimate partners. The jury acquitted Respondent of the murder charges, but convicted her of voluntary manslaughter.

The Court of Appeals held that the trial court erred in its instruction to the jury that, before it could consider all the evidence (including evidence of alleged prior abuse relied upon by the expert witness), it must first find that the victim repeatedly abused Respondent. In addition, the instruction was ambiguous regarding the relevance of the evidence of past abuse to the jury's assessment of whether Respondent suffered from Battered Spouse Syndrome. The Battered Spouse Syndrome statute, Md. Code Ann., Cts. & Jud. Proc. § 10-916 (2020 Repl. Vol.), does not require a jury to make a finding that the victim repeatedly abused the defendant before it may consider all evidence of prior abuse, and expert testimony relying on such abuse, in assessing whether the defendant suffered from Battered Spouse Syndrome. When a defendant has introduced evidence of past abuse and abuse by the victim, and her expert witness has opined that the prior abuse and the victim's abuse contributed to the defendant's development of Battered Spouse Syndrome, a trial court may not emphasize the victim's abuse over other abuse suffered by the defendant in its instruction on Battered Spouse Syndrome.

The Court further held that the instructional errors were not harmless beyond a reasonable doubt.

Circuit Court for Wicomico County
Case No. C-22-CR-17-000393
Argued: October 1, 2020

IN THE COURT OF APPEALS

OF MARYLAND

No. 3

September Term, 2020

STATE OF MARYLAND

v.

LATOYA BONTE ELZEY

Barbera, C.J.
McDonald
Hotten
Getty
Booth
Biran
Battaglia, Lynne A.
(Senior Judge, Specially Assigned),

JJ.

Opinion by Biran, J.
McDonald and Booth, JJ., concur.

Filed: January 29, 2021

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

Latoya Bonte Elzey grabbed a butcher knife during a heated argument with her boyfriend, Migail Hunter. A few minutes later, Hunter fell to the floor with a knife wound to his heart. By the time an ambulance arrived, Hunter was dead.

At her murder trial in the Circuit Court for Wicomico County, Elzey did not dispute that she killed Hunter, but claimed that she did so in self-defense. To support her theory of self-defense, Elzey introduced expert testimony from a psychiatrist concerning Battered Spouse Syndrome (sometimes referred to in this opinion as the "Syndrome"). The expert testified that Elzey suffered from Battered Spouse Syndrome at the time of Hunter's killing as a result of her history of abusive relationships, including her relationship with Hunter.

The jury acquitted Elzey of the murder charges, but convicted her of voluntary manslaughter. On appeal, Elzey argued that the trial judge's instruction to the jury concerning Battered Spouse Syndrome was erroneous. The Court of Special Appeals agreed with Elzey, holding that the instruction incorrectly required the jury to make a predicate finding that Hunter repeatedly abused Elzey, before the jury could consider the evidence of past abuse and the expert testimony Elzey had presented. The court also concluded that the instruction gave the jury "mixed messages" about how it should evaluate the evidence of past abuse in relation to the Syndrome and Elzey's claim of self-defense. Because it determined that the erroneous instruction was not harmless beyond a reasonable doubt, the court ordered a new trial. The State then sought further review in this Court.

For the reasons discussed below, we agree with the Court of Special Appeals and Elzey that the trial court erred in its formulation of the jury instruction on Battered Spouse Syndrome, and that this error was not harmless beyond a reasonable doubt.

# I

## Background

### A. The Killing of Migail Hunter

In May 2017, Elzey and Hunter had been together for approximately one year. Hunter was six feet, two inches tall and 41 years old. Elzey was 26 years old and five feet, six inches tall.

Elzey and Hunter were homeless in May 2017. Elzey's friend, Shatoria Hope, allowed Elzey and Hunter to stay temporarily in her small apartment in Salisbury, Maryland, which Ms. Hope shared with her children. Around midnight on May 21, 2017, after an afternoon and evening of drinking on May 20, Elzey and Hunter began to argue in the living room of Ms. Hope's apartment. Ms. Hope was cooking in the adjoining kitchen at the time, and heard Elzey and Hunter arguing. Hunter was angry about something he had seen on Elzey's phone. After yelling at Hunter to keep his hands off her, Elzey came into the kitchen and grabbed a knife. Ms. Hope persuaded Elzey to put the knife back, and Elzey returned to the living room, where she and Hunter resumed their argument. Elzey tried to explain to Hunter what he had seen on her phone. Ms. Hope then heard a loud slapping sound, followed immediately by Elzey telling Hunter to stop hitting her. Soon after that, Elzey came back into the kitchen. She was crying and yelling that she was tired of Hunter putting his hands on her. Elzey again grabbed a knife. This time, Elzey left the kitchen with the knife – specifically, a large butcher knife – and went back into the living room.

Elzey and Hunter continued arguing for several minutes. Ms. Hope heard Elzey repeatedly yell at Hunter about his putting his hands on her. Ms. Hope also heard Hunter

repeatedly say, "go ahead, go ahead and do it," or "do what you got to do." Ms. Hope turned from the stove and looked into the living room. Although she had an obstructed view due to a partial wall that separated the kitchen and living room, Ms. Hope saw Hunter walk up toward Elzey, as he said, "do it, do it, if you're going to stab me." Ms. Hope did not see what then occurred between Elzey and Hunter, but she heard a loud "boom" come from the living room. When Ms. Hope went into the living room to find out what had caused the noise, she saw Hunter on the floor. Ms. Hope asked Elzey what had happened. Elzey told her that Hunter had walked into the knife.

Hunter died a few minutes later as a result of a stab wound that punctured his aorta. The knife also injured one of Hunter's ribs. The wound was one inch long and two inches deep; its path was right to left and upward.

A grand jury in Wicomico County subsequently returned an indictment against Elzey, charging her with murder and related offenses.

## B. Trial

### 1. Evidence Relating to Elzey's Claim of Self-Defense

Elzey's trial began on June 25, 2018. Ms. Hope testified to what she heard and saw, as summarized above. The State also played a videotaped statement that Elzey gave to the Maryland State Police in the early morning hours of May 21, 2017. In that statement, Elzey told the officers that Hunter physically abused her, and that, at one point, Hunter's abuse had led her to seek refuge at a relative's home.

Elzey testified in her own defense. She told the jury that she had no vehicle on the night of May 20-21 and nowhere to go. She testified that Hunter had her ID card, Social

3

Security card, food stamp card, and other personal items of hers in his wallet. Elzey claimed that Hunter kept those items because "[h]e was very possessive" and "would not allow me to carry my own items."[1]

Elzey also testified about physical abuse that Hunter inflicted on her, which she said began within two months of the start of their relationship. According to Elzey, Hunter frequently would choke her or would force her to perform oral sex. Elzey testified that Hunter's bouts of rage were often sparked by jealousy involving other men's interest in Elzey. Elzey told the jury that, despite Hunter's abuse, she stayed with Hunter "because I loved him, and I . . . believed that he was going to change." Elzey further testified that she and Hunter were not staying with her family members in the area because her relatives "were not accepting the fact that I was with a man that was beating on me."[2]

Over the State's objection, the trial court allowed Elzey to provide the jurors with details concerning abuse by other intimate partners before her relationship with Hunter.[3] Elzey told the jurors about a past boyfriend who punched her in the face on a weekly basis, giving her multiple black eyes. She said she went to the hospital twice for treatment following that boyfriend's assaults. Elzey also testified about another prior relationship in

---

[1] One of the officers who interviewed Elzey testified that police, in fact, discovered some of Elzey's personal items in Hunter's wallet after his death.

[2] Two of Elzey's relatives testified that they saw Hunter assault and/or beat Elzey while Elzey and Hunter were a couple.

[3] The trial court allowed this testimony as foundational to the offering of expert testimony on the Battered Spouse Syndrome, in light of *Wallace-Bey v. State*, 234 Md. App. 501 (2017). We discuss *Wallace-Bey* below.

which her then-boyfriend (who was also the father of one of her children) broke her jaw, requiring doctors to wire her mouth shut.

Elzey testified that, during the few days that she and Hunter stayed at Ms. Hope's house, there was a point when Elzey and Hunter were the only adults in the apartment because Ms. Hope was at a hospital. After Ms. Hope's children went to bed, Hunter became angry at Elzey when she would not have sex with him. According to Elzey, Hunter then choked her to the point that she could not breathe.

At midnight on May 21, according to Elzey, Hunter had her phone and was going through it. Hunter saw that a man had pictures of Elzey in the man's Facebook account, which caused Hunter to "go[] off." According to Elzey, Hunter "was steady arguing with me, steady yelling at me, steady cussing at me." Elzey said that, as the argument escalated, Hunter was "approaching me in my space," "push[ing] me in my head," and "making me feel threatened for my life."

Elzey told the jury that she grabbed the knife "as a scare away, to keep you away from me, like do not come nowhere near me. I have this. I'm not trying to use it against you. I'm just telling you to stay away from me." Elzey described Hunter's response after she reappeared in the living room with the knife: "He just said, excuse my language, he said, fuck that, bitch. You're going to have to do something. You're going to have to use that knife. That knife does not scare me." Elzey testified that Hunter "continued to come and approach me . . . He was in my face . . . I could feel his spit, he was pretty close to me." Elzey stated that she was "holding the knife up" as Hunter approached her. She claimed that she turned her head away from Hunter, because "I don't want to look at him,

5

and he's steady coming towards me, and I'm just not looking at him. And then all a sudden, he collapsed."

The defense called Dr. Neil Blumberg, a psychiatrist, to testify as an expert witness. Dr. Blumberg told the jury that he had conducted a psychiatric evaluation of Elzey to determine her mental state at the time of the alleged offense. Dr. Blumberg concluded that, at the time of Hunter's death, Elzey was suffering from a number of mental disorders, including severe Post-Traumatic Stress Disorder ("PTSD"), Unspecified Depressive Disorder, moderate Alcohol Use Disorder, and mild Cannabis Use Disorder. Dr. Blumberg opined that Elzey's PTSD and depression were the direct result of the domestic violence she had suffered at the hands of several intimate partners and severe physical abuse that her grandmother inflicted on her during childhood. According to Dr. Blumberg, Elzey's constellation of mental disorders was consistent with what he often sees in someone who suffers from Battered Spouse Syndrome.

Dr. Blumberg described Battered Spouse Syndrome as a psychological condition in which a person experiences repeated episodes of abuse by an intimate partner, becomes depressed, and, because she feels she cannot leave the relationship, convinces herself that the abuser will change. Dr. Blumberg explained that women with the Syndrome develop "learned helplessness," in which they feel unable to change their situation. He described the cycles of abuse that are indicative of the Syndrome and how victims of abuse are able to sense that a confrontation is escalating and, therefore, that "things are going to happen."

Dr. Blumberg's opinion that Elzey suffered from Battered Spouse Syndrome was based on the totality of Elzey's past relationships and the pattern of abuse she suffered at

6

the hands of three intimate partners, including Hunter. Dr. Blumberg first described Elzey's relationship with the boyfriend who broke her jaw. That relationship began when Elzey was 18 and lasted five years:

> They began arguing more primarily after she began spending more time with their child. He, apparently, felt ignored, and he began physically abusing her. She said, smacking her, emotionally abusing her, putting her down, becoming increasingly controlling.

> He would explode and hit her. . . . And she described over this extended period of about five years going through what is generally referred to as a cycle of violence. Things would kind of escalate. There would be more arguing. There would be an explosive outburst where she would be beaten in some way.

> He then would tend to be apologetic. I'm sorry. It's never going to happen again, and they'd go through a period in which things were really positive before the next irritant and escalation and explosive outburst where she was the one who generally got injured.

Dr. Blumberg explained that, after the relationship with that boyfriend ended, Elzey was in another abusive relationship in 2015-16. In this next relationship, Dr. Blumberg noted, "[e]verything was fine for the first six months, and then he started to become abusive." The boyfriend had "[p]roblems with anger." There would be physical outbursts, in which he "blackened her eyes, . . . busted her lip, created a gash on her head. He would beat her if she wouldn't give him money." Elzey was "too afraid to leave him," but when this boyfriend left the state, Elzey "basically escaped and moved away."

Almost immediately after that relationship ended, Elzey became involved with Hunter, who began to abuse her within two months. In light of Elzey's prior abusive relationships, Dr. Blumberg described Elzey's relationship with Hunter as "the same old, same old . . . [S]he has just escaped from an abusive relationship. Here's a guy who takes

7

her in. Everything is fine, initially. And then they become homeless. They're drinking. He's using cocaine. And they begin to have these increasingly verbal abusive interactions that ultimately result in physically abusive actions."[4]

    2.   The Jury Instruction on Battered Spouse Syndrome

Defense counsel proposed the following jury instruction on Battered Spouse Syndrome (which she referred to as Battered Woman's Syndrome[5]):

> If you find, based on the testimony presented, that the defendant suffered from Battered Woman's Syndrome, you may consider how the effects of this condition may have altered the defendant's mental state. Specifically, you may consider this evidence in deciding whether the defendant actually believed that she needed to defend herself against an imminent threat and whether that belief was reasonable based on all the facts and circumstances as they have been made known to you by the evidence and the testimony in this case.
>
> You may consider whether the presence of Battered Woman's Syndrome altered the defendant's perceptions and beliefs, including her perceptions and beliefs about the danger of the threat posed to her and that the danger was imminent.

---

[4] The State did not call an expert witness to rebut Dr. Blumberg's testimony.

[5] Some scholars refer to the Syndrome as "Battered Spouse Syndrome," while others use "Battered Woman Syndrome" (or "Battered Woman's" or "Battered Women's" Syndrome). *See, e.g.*, Lenore E. Walker, *Battered Woman Syndrome*, Psychiatric Times, No. 7, July 8, 2009, available at https://perma.cc/H7QK-KSBF; Katie Fair, *Battered Spouse Syndrome: A Comparative Regional Look at Domestic Abuse and Self-Defense in Criminal Courts*, 5 Lincoln Mem. U. L. Rev. 1 (2018). The Maryland statute on the Syndrome (which we discuss in detail below) refers primarily to "Battered Spouse Syndrome," but notes that the Syndrome "is also recognized in the medical and scientific community as the 'Battered Woman's Syndrome.'" Md. Code Ann., Cts. & Jud. Proc. ("CJP") § 10-916(a)(2) (2020 Repl. Vol.). When we refer to the Syndrome in non-abbreviated form in this opinion, we follow the General Assembly's lead and use the term "Battered Spouse Syndrome." However, we recognize that a person need not be the "spouse" of a batterer to develop the Syndrome.

You must determine the reasonableness of the defendant's belief[s] and actions based on those beliefs in light of the circumstances as they appeared to the defendant at the time of the killing, and as they are evaluated by you now. Reasonableness is based both on the defendant's beliefs and on your evaluation as to their reasonableness.

If the defendant presents credible evidence of self[-]defense, the State must prove beyond a reasonable doubt that the defendant did not act in self-defense. If you have a reasonable doubt as to whether or not the defendant acted in self-defense, your verdict must be not guilty.

The trial court declined to give the Battered Spouse Syndrome instruction suggested by the defense. Rather, the court indicated it was inclined to model its instruction on instruction 8.13(G) in David E. Aaronson, *Maryland Criminal Jury Instructions and Commentary* (2014-15 ed.).[6] Aaronson's model instruction provides, in pertinent part:

You have heard evidence that the defendant was a victim of repeated physical and psychological abuse by _____ (*insert name of victim*). You have also heard from an expert witness that a person who is a victim of repeated physical and psychological abuse by a [spouse] [former spouse] [child] [(cohabitant) (co-occupant)] [former (co-habitant) (co-occupant)] may suffer from a psychological condition called "Battered [Spouse] [Woman] [Child] Syndrome." [Also, you heard expert testimony that the defendant exhibits the characteristics consistent with "battered [spouse] [woman] [child] syndrome".]

You must determine based on a consideration of all of the evidence whether the defendant was a victim of repeated physical and psychological abuse by _____ (insert name of victim), and if so, whether [she] [he] suffered from "Battered [Spouse] [Woman] [Child] Syndrome."

If you determine that _____ (*insert name of defendant*) suffered from battered [spouse] [woman] [child] syndrome, then you should consider this evidence for the purpose of explaining _____'s (*insert name of*

_____

[6] The Maryland Criminal Pattern Jury Instructions do not contain an instruction on Battered Spouse Syndrome. However, the pattern instruction on self-defense includes commentary relating to the Syndrome. *See* Maryland State Bar Ass'n, *Maryland Criminal Pattern Jury Instructions* 5:07 (2d ed. 2018).

9

*defendant*) motive or state of mind, or both, and [her] [his] beliefs and perceptions at the time of the commission of the alleged offense in order to determine whether the requirements of self-defense exist.

*Id.*

Defense counsel objected to the court's proposed instruction:

Your Honor, the only . . . change that the defense was planning to suggest was the language with regard to abuse by the victim. Because of *Wallace-Bey v. State*, [234 Md. App. 501 (2017),] . . . we offered . . . two suggested . . . instructions, one of which would indicate ["]by the victim and others,["] but the other would just say, ["]repeated physical and psychological abuse["] period, without indicating specifically as to by whom.

The trial court responded:

Well, would it be necessary under your understanding of the law that [the jury] be convinced that there was repeated physical and psychological abuse by the victim? Because it seems to me that that's a requirement. It's also true that . . . it could be ["]and others.["]

Although the trial court, thus, initially seemed amenable to changing the language in the proposed instruction so that it referred to abuse by "the victim and others," the court quickly changed course. Referring to Aaronson's model instruction, the court stated:

Actually, it says, ["Y]ou must determine based on [a] consideration of all the evidence whether the defendant was a victim of repeated physical and psychological abuse by["] the victim, in the second paragraph. And I believe that they would have to so find. . . . I'm not hearing the case law to be that you may use the Battered Spouse Syndrome to justify the killing of anyone. You know, you have to be using it to just . . . mitigate or excuse. . . . [I]f the individual who has died didn't abuse you in any way, I don't think that you're allowed to invoke the defense.

As the discussion continued, defense counsel again did not take issue with the inclusion of the reference to the "victim" in the second paragraph of the instruction, but reiterated her

request that the instruction refer in that spot to "the victim and others." The following

colloquy then occurred:

> THE COURT: Well, what if they find that . . . the defendant was a victim of abuse by others but not the victim? It doesn't really matter whether they believe the testimony of . . . her abuse [by] others if they believe that she was abused by the victim; right?
>
> [DEFENSE COUNSEL]: Well, I think it could . . . matter in the sense that her reaction may be affected by the abuse by the others piling onto the abuse by the victim.
>
> THE COURT: But that would assume that there was repeated psychological abuse by the victim; right?
>
> [DEFENSE COUNSEL]: Yeah . . . and that's why the language I suggest would include both, not just one. I don't think she can rely on solely abuse by others, but if it lists both the victim and others, then that's not relying solely on the abuse by others against her.
>
> [PROSECUTOR]: But she is not allowed to murder her current boyfriend because four boyfriends ago beat her up. And that's what that instruction would be saying.

After the close of the evidence, the trial court instructed the jury on the concepts of

perfect self-defense (which the trial court referred to as "complete" self-defense) and

imperfect self-defense (which the court called "partial" self-defense):

> Self-defense is a complete defense and you are required to find the Defendant not guilty of all charges if all of the following four factors are present: one, the Defendant was not the aggressor; two, the Defendant actually believed that she was in immediate or imminent danger of death or serious bodily injury; three, the Defendant's belief was reasonable; and four, the Defendant used no more force than was reasonably necessary to defend herself in light of the threatened or actual force.
>
> In order to convict the Defendant the State must prove that self-defense does not apply in this case. This means that you are required to find the Defendant not guilty of all charges unless the State has persuaded you beyond a

11

reasonable doubt that at least one of the four factors of complete self-defense was absent.

Partial self-defense applies only to first and second degree murder and first degree assault. If you find that the Defendant did not act in complete self-defense, the Defendant may still have acted in partial self-defense. If the Defendant actually believed that she was in immediate or imminent danger of death or serious bodily harm, even though a reasonable person would not have so believed, the Defendant's actual, though unreasonable, belief is a partial self-defense and the verdict should be guilty of voluntary manslaughter and/or second degree assault and/or reckless endangerment.

If the Defendant used greater force than a reasonable person would have used, but the Defendant actually believed that the force was necessary, the Defendant's actual though unreasonable belief is a partial self-defense and the verdict should be guilty of voluntary manslaughter and/or second degree assault and/or reckless endangerment.

The court then gave its Battered Spouse Syndrome instruction, modifying the

Aaronson language slightly:

Ladies and gentlemen, you have heard evidence that the Defendant was a victim of repeated physical and psychological abuse. You have also heard from an expert witness that a person who is a victim of repeated physical and psychological abuse by a victim may suffer from a psychological condition called battered spouse syndrome. You have also heard expert testimony that the Defendant exhibits the characteristics consistent with battered spouse syndrome.

You must determine, based upon a consideration of all the evidence, whether the Defendant was a victim of repeated physical and psychological abuse by the victim, and if so[,] whether she suffered from battered spouse syndrome.

If you determine that the Defendant suffered from battered spouse syndrome[,] then you should consider this evidence for the purpose of explaining the Defendant's motive or state of mind, or both, and her beliefs and perceptions at the time of the commission of the alleged offense in order to determine whether the requirements of self-defense exist.[7]

---

[7] The trial court then continued with directives on how, specifically, the jury could consider evidence of Battered Spouse Syndrome in determining whether the requirements of self-defense were present in Elzey's case. Because this portion of the trial court's

After the trial court instructed the jury, Elzey's counsel excepted to the instruction on Battered Spouse Syndrome, at which time the following colloquy occurred:

> [DEFENSE COUNSEL]: For the record, I know I said this yesterday, but we did request, the defense requested in the battered spouse syndrome instruction that in the second paragraph listed where the instruction reads that if it was a victim of repeated physical and psychological abuse the Court indicated ["]by the victim,["] we did make a request that ["]and others["] be included. I would note our objection to –
>
> THE COURT: Right. And I concluded because the [Battered Spouse Syndrome] statute[8] requires that there be a finding by the jury that this victim had engaged in repeated physical and psychological abuse of [Elzey] because otherwise . . . battered spouse syndrome doesn't apply. I will not in any way restrict your argument because it goes on to say that you have to determine, based upon the consideration of all the evidence, whether the Defendant was a victim of repeated physical and psychological abuse by the

---

instruction on the Syndrome is not at issue in this case, we omit it here for purposes of brevity.

[8] The Battered Spouse Syndrome statute provides, in relevant part:

> Notwithstanding evidence that the defendant was the first aggressor, used excessive force, or failed to retreat at the time of the alleged offense, when the defendant raises the issue that the defendant was, at the time of the alleged offense, suffering from the Battered Spouse Syndrome as a result of the past course of conduct of the individual who is the victim of the crime for which the defendant has been charged, the court may admit for the purpose of explaining the defendant's motive or state of mind, or both, at the time of the commission of the alleged offense:
>   (1) Evidence of repeated physical and psychological abuse of the defendant perpetrated by an individual who is the victim of a crime for which the defendant has been charged; and
>   (2) Expert testimony on the Battered Spouse Syndrome.

CJP § 10-916(b). The statute provides that a trial court may admit Syndrome evidence in a case where the defendant has been charged with first-degree murder, second-degree murder, manslaughter (or attempt to commit any of those crimes), or with first-degree assault. *Id.* § 10-916(a)(3).

13

victim and if so whether she suffered from battered spouse syndrome. My understanding is that we heard the testimony of other acts of abuse in aiding us in deciding whether she suffered from battered spouse syndrome. So I think your argument will clear it up if it's otherwise unclear. So I'll note your exception.

In her closing argument, the prosecutor provided the jury with her interpretation of the court's Battered Spouse Syndrome instruction:

When you're considering battered spouse syndrome you must base your decision on whether the Defendant was the victim of repeated physical and psychological abuse by Migail Hunter, not anybody else, by Migail Hunter. Why? Because a prior, terrible, horrible, awful upbringing and relationships, all of that doesn't mean at age 26, several years later, you're allowed to murder an innocent man. He has to have been the one who was causing such repeated physical and psychological abuse that it [led] to this.

The jury acquitted Elzey of first-degree murder, second-degree murder, and first-degree assault. The jury convicted Elzey of voluntary manslaughter, second-degree assault, and reckless endangerment. The circuit court merged the second-degree assault and reckless endangerment convictions into the voluntary manslaughter conviction for sentencing and imposed a sentence of 10 years of imprisonment.

## C. Appeal

On appeal, Elzey raised several claims of error. Pertinent here, Elzey argued that the trial judge erred in instructing the jury on Battered Spouse Syndrome in two respects. First, according to Elzey, the instruction confused the jury concerning the relevance of abuse by others besides Hunter with respect to Battered Spouse Syndrome (the "juror confusion issue"). Second, Elzey contended that the instruction erroneously directed the jury to make a predicate factual finding that Hunter repeatedly abused Elzey before it could consider the evidence of abuse by others and Dr. Blumberg's expert testimony on the

14

Syndrome (the "predicate finding issue"). The State argued that the instruction was correct in all respects, and that the trial court acted within its discretion in delivering it.

The Court of Special Appeals agreed with Elzey that the Battered Spouse Syndrome jury instruction was erroneous, both because it improperly required the jury to make a predicate finding that Hunter repeatedly abused Elzey, and because it was confusing as to the relevance of Elzey's past abuse by others. *Elzey v. State*, 243 Md. App. 425, 437-39 (2019). The court further held that the instructional error was not harmless beyond a reasonable doubt, and therefore ordered a new trial. *Id.* at 439-40.

On January 8, 2020, the State filed a petition for *certiorari* seeking review of the following question: "Was the Court of Special Appeals wrong in holding that a jury may not be instructed to find that the victim abused the defendant and the defendant suffers from Battered Spouse Syndrome before considering expert testimony on the syndrome?" On March 11, 2020, we granted the State's petition. 467 Md. 691 (2020).[9]

---

[9] The State's petition did not explicitly seek review of the Court of Special Appeals' holding concerning the juror confusion issue. Elzey has moved to dismiss the writ of *certiorari* as improvidently granted. Elzey argues that the Court of Special Appeals' holding on the juror confusion issue provides an independent ground for reversal of the judgment of conviction, and that the State's failure to appeal that part of the intermediate appellate court's decision would render any ruling by this Court on the predicate finding issue purely advisory.

"It is a settled principle of Maryland procedure that, for purposes of preservation in various contexts, where the issue raised by a litigant is sufficiently interrelated with another issue not raised, the court will treat them as if both issues were raised by the litigant." *Unger v. State*, 427 Md. 383, 407-08 (2012). In our view, the predicate finding and the juror confusion issues in this case are "so intertwined that they should be treated as a single issue for the purposes of preservation." *Id.* at 407. Both issues concern the same jury instruction. Moreover, in addressing both issues, we must consider the interplay between evidence of abuse of the defendant by the decedent, and evidence of prior abuse of the defendant by others. In addition, as part of our resolution of the juror confusion issue, we

15

## II

## Standard of Review

We review a trial court's giving of a jury instruction for abuse of discretion. *See Keller v. Serio*, 437 Md. 277, 283 (2014). "In determining abuse of discretion in this context, we look to the following factors: (1) whether the requested instruction was a correct statement of the law; (2) whether it was applicable under the facts of the case; and (3) whether it was fairly covered in the instructions actually given." *Seley-Radtke v. Hosmane*, 450 Md. 468, 482 (quoting *Keller*, 437 Md. at 283). We review *de novo* whether a jury instruction was a correct statement of the law. *See id.* This is the case because "even in areas where a trial court has discretion, no discretion is afforded to trial courts to act upon an erroneous conclusion of law." *Id.* (cleaned up). Similarly, a trial court lacks discretion to give an instruction that is "ambiguous, misleading, or confusing to jurors." *Thomas v. State*, 413 Md. 247, 257 (2010) (internal quotation marks and citation omitted). Reversal of a conviction and a new trial are warranted where the State does not show that an instructional error was harmless beyond a reasonable doubt. *Porter v. State*, 455 Md. 220, 234 (2017). To meet this burden, the State must show that the error did not play any role in the jury's verdict. *Id.* "To say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed by the record." *Bellamy v. State*, 403 Md. 308, 332 (2008).

---

will consider whether the part of the instruction that required the jury to make predicate findings is ambiguous. For these reasons, we deny Elzey's motion to dismiss the writ of *certiorari*, and will address both issues.

**Discussion**

**A. The Trial Court Erred in Its Instruction on Battered Spouse Syndrome.**

1. The Use of Battered Spouse Syndrome Evidence in Criminal Cases

"Battered Spouse Syndrome" has been officially recognized in Maryland law since 1991, when the General Assembly approved House Bill 49, which was codified at section 10-916 of the Courts and Judicial Proceedings Article. *See* 1991 Md. Laws 2275.

In the medical and scientific communities, the Syndrome is considered a subcategory of PTSD. PTSD is "a collection of thoughts, feelings, and actions that logically follow a frightening experience that one expects could be repeated." Lenore E.A. Walker, *Battered Women Syndrome and Self-Defense*, 6 Notre Dame J.L. Ethics & Pub. Pol'y 321, 327 (1992). Women in abusive relationships who suffer from Battered Spouse Syndrome "respond to the repeated abuse in a manner similar to others who have been repeatedly exposed to different kinds of trauma." *Id.* at 326. Over the past three decades, courts and legislatures have come to understand that evidence concerning the Syndrome can shed light on the effects of repeated physical, sexual, and psychological abuse on a person's state of mind, and thereby provide support for claims of self-defense, insanity, and duress. *See generally* Robert Coleman, *Battered Woman Syndrome*, 10 Geo. J. Gender & L. 333, 335-41 (2009) (describing the evolution of the Syndrome in the legal system); *The Validity and Use of Evidence Concerning Battering and Its Effects in Criminal Trials: Report Responding to Section 40507 of the Violence Against Women Act*, NCJ 160972 (Dept. of Justice, May 1996), available at https://perma.cc/X4PA-LU57 (reviewing scientific and

clinical literature concerning battering and its effects, the implications for criminal cases involving battered defendants, and the role of expert testimony in such cases).

The plain text of the Battered Spouse Syndrome statute, CJP § 10-916, permits the trial court to admit expert testimony regarding the Syndrome to explain the state of mind of a defendant at the time of the alleged criminal offense. The General Assembly has recognized the Syndrome as both a medical and psychological condition. *See* CJP § 10-916(a) ("'Battered Spouse Syndrome' means the psychological condition of a victim of repeated physical and psychological abuse by a spouse, former spouse, cohabitant, or former cohabitant which is also recognized in the medical and scientific community as the 'Battered Woman's Syndrome'."). In enacting the statute, the General Assembly recognized that expert testimony may be necessary to explain the complexity of the Syndrome and how it may cause a battered person to act in ways that are counter-intuitive to the average lay person.

In several cases, the Court of Special Appeals and this Court have addressed the relevance of the Syndrome in criminal cases. In the earliest case following the statute's enactment, *Banks v. State*, the Court of Special Appeals clarified that CJP § 10-916 did not "create a new defense to murder." 92 Md. App. 422, 429 (1992). "Rather, evidence of the Battered Spouse Syndrome is offered in support of the state of mind element of perfect or imperfect self-defense, *i.e.*, it is offered to prove the honesty and reasonableness of the defendant's belief that he or she was in imminent danger at the time of the offense." *Id.* This Court has reiterated that point. *See State v. Smullen*, 380 Md. 233, 251 (2004)

18

(declining to recognize the Syndrome as an independent defense, and explaining that Syndrome evidence is admitted to support a claim of self-defense).

In *Smullen*, we identified two key aspects of the Syndrome that are relevant to a self-defense claim. *Id.* at 254-55. The first aspect is learned helplessness, which describes how victims of repeated abuse come to believe that they cannot control the abusive situation and eventually become passive and submissive. *Id.* at 254 (citing Hope Toffel, *Crazy Women, Unharmed Men, and Evil Children: Confronting the Myths About Battered People Who Kill Their Abusers, and the Argument for Extending Battering Syndrome Self-Defenses to All Victims of Domestic Violence*, 70 S. Cal. L. Rev. 337, 350 (1996)). We said that "[t]his is a key aspect in the purported relevance of the syndrome in a self-defense context, as it offers an explanation of why the defendant, having been previously subjected to abuse, simply did not leave the home or take some other action against her abuser." *Id.* at 254-55.

The second aspect of the Syndrome that is relevant to self-defense is the defendant's ability to "sense the escalation in the frequency and intensity of the violence," and heightened sensitivity to the abuser's behavior. *Id.* at 255; *see also Banks*, 92 Md. App. at 429 ("The cyclical nature of an intimate battering relationship enables a battered spouse to become expert at recognizing the warning signs of an impending assault from her partner— signs frequently imperceptible to outsiders. For some victims, the sign may be 'that look in his eye'; for others, it is the advent of heavy drinking, or heightened irrational jealousy.") (citation omitted).

19

We observed that acknowledging the relevance of Syndrome evidence "is not inherently inconsistent with the traditional definition or elements of self-defense." *Smullen*, 380 Md. at 250. Rather, analysis of the applicability of the Syndrome

> merely requires a more careful and sophisticated look at the notion of imminent threat and what constitutes 'aggression,' of understanding that certain conduct that might not be regarded as imminently dangerous by the public at large can cause someone who has been repeatedly subjected to and hurt by that conduct before to honestly, even if unreasonably, regard it as imminently threatening.

*Id.*; *see also Katsenelenbogen v. Katsenelenbogen*, 365 Md. 122, 139 (2001) ("A person who has been subjected to [domestic violence] may well be sensitive to non-verbal signals or code words that have proved threatening in the past to that victim but which someone else, not having that experience, would not perceive to be threatening. The reasonableness of an asserted fear emanating from that kind of conduct or communication must be viewed from the perspective of the particular victim.").

The Court of Special Appeals' decision in *State v. Peterson* highlighted the importance of Syndrome evidence to a defendant's ability to explain his/her state of mind at the time of the offense. 158 Md. App. 558 (2004). There, the intermediate appellate court affirmed a post-conviction court's grant of relief to a defendant who was convicted of first-degree murder, second-degree murder, battery, and use of a handgun in the commission of a felony, after she shot and killed her husband while he was sitting in a chair watching television. *Id.* at 566. At trial, the defendant pursued the defense of not criminally responsible ("NCR"). *Id.* at 565. To that end, trial counsel elicited testimony from a defense expert that the defendant suffered "bi-polar mixed disorder with psychotic features and

dissociative disorder not otherwise specified." *Id.* However, trial counsel did not question the expert about whether the defendant suffered from Battered Spouse Syndrome at the time of the killing. *Id.* at 566. At the close of the evidence, the defense proposed an instruction on imperfect self-defense. *Id.* The court rejected the instruction on the ground that it was not generated by the evidence. *Id.* Following jury deliberations, the jury rejected the NCR defense and found the defendant guilty of murder and other charges. *Id.*

The defendant subsequently filed a petition for post-conviction relief, alleging ineffective assistance of counsel. *Id.* at 567. A hearing revealed that the defendant had informed her trial counsel that the decedent abused her repeatedly throughout their 27-year relationship. *See id.* at 567, 581. The court also heard testimony from the defense's expert witness, who testified that she had formed the opinion that the defendant had been suffering from the Syndrome, and that she explained her thinking to trial counsel before the trial. *Id.* at 577. Based on this and other evidence, the post-conviction court granted the defendant a new trial. *Id.* at 581.

> The Court of Special Appeals affirmed, concluding that
>
> [i]f trial counsel had introduced factual and expert opinion evidence of battered spouse syndrome, which was available and which he knew or should have known was available, the defense of imperfect self-defense would have been generated, and would have been presented to the jury to decide. It is reasonably probable that, if that defense had been decided by the jury, the result of the proceeding would have been different. Accordingly, the post-conviction court properly concluded that trial counsel's deficient performance prejudiced the appellee's defense.

*Id.* at 597.

In *Porter v. State*, this Court considered whether a person who hires a third party to act against her abuser forfeits the right to claim imperfect self-defense. 455 Md. 220 (2017). We concluded that because "[i]mperfect self-defense negates the element of malice, not premeditation," a woman "claiming imperfect self-defense must present evidence that she feared imminent or immediate danger at the time of the killing – she does not have to show that she acted spontaneously." *Id.* at 250. Therefore, "[t]he means by which a woman takes defensive action against her abuser does not affect whether she actually believed she was in imminent danger at the time of the killing." *Id.*

*Wallace-Bey v. State* is the most recent appellate case interpreting CJP § 10-916 and how Syndrome evidence is to be used during a criminal trial. 234 Md. App. 501 (2017). There, the Court of Special Appeals considered whether the trial court impermissibly limited the testimony of the defendant (Wallace-Bey) and the defense expert. *Id.* at 511.

Wallace-Bey killed her boyfriend while he was lying in bed after having allegedly raped her. *Id.* at 523. At trial, Wallace-Bey asserted a self-defense theory as her sole defense to a first-degree murder charge. *Id.* at 530. The trial court excluded evidence of prior abuse by anyone other than the decedent. *Id.* at 518-19.

The intermediate appellate court held that the trial court's ruling on the evidence of prior abuse was erroneous, because CJP § 10-916 "is silent as to whether the court may admit evidence of abuse of the defendant by persons other than the [decedent]," and evidence of that sort "could still be admissible under some other provision or theory of relevance." *Id.* at 549. The court concluded that information about prior abuse "could have assisted the jury in evaluating the validity and probative value" of the defense expert's

22

opinion. *Id.* at 550. The court pointed to a report prepared by Wallace-Bey's expert (Dr. McGraw), which made clear that

> Wallace-Bey's exposure to traumatic experiences, including childhood sexual abuse, was a cornerstone of Dr. McGraw's conclusion about how battered spouse syndrome affected Wallace-Bey's actions during the shooting. Citing published research, Dr. McGraw opined that Wallace-Bey's history of abuse made her vulnerable to being in a relationship in which she "re-experienced the pattern of domestic violence she had been exposed to in childhood." According to Dr. McGraw, medical literature indicates that a history of being battered can have a "direct effect" on a battered woman's "state of mind and her appraisal of danger[.]" Dr. McGraw added that persons with long histories of trauma respond to threats "in the context of the sum total of their total traumatic life experiences" and that the "cumulative effect of violence" can "severely alter[]" a person's "ability to cope with a threat[.]"

*Id.* at 549-50. The court held that, "[b]y linking the evidence of Wallace-Bey's history of abuse to the basis for Dr. McGraw's expert opinion," Wallace-Bey sufficiently established the relevance of that evidence. *Id.* at 550. The court continued:

> Indeed, the components of Dr. McGraw's report that discuss Wallace-Bey's history of other abuse pertain to the two aspects of battered spouse syndrome (learned helplessness and heightened sensitivity) that are most probative to the elements of perfect and imperfect self-defense. Information about that prior abuse could have assisted the jury in evaluating the validity and probative value of Dr. McGraw's opinion.

*Id.* The intermediate appellate court remanded for a new trial. *Id.* at 562.

With these precedents in mind, we consider whether the trial court's instruction to Elzey's jury concerning Battered Spouse Syndrome was erroneous.

2. The Predicate Finding Issue

The Court of Special Appeals held that the trial court erred in interpreting CJP § 10-916 to require the jury to find that Hunter repeatedly abused Elzey before it could consider all the evidence admitted (including Dr. Blumberg's expert testimony) to prove that Elzey

23

suffered from Battered Spouse Syndrome. *Elzey*, 243 Md. App. at 437-39. We agree that the trial court erred in instructing the jury to conduct this preliminary inquiry.

As pertinent specifically to the predicate finding issue, the trial court instructed the jury (in the second paragraph of the Syndrome instruction):

> You must determine, based upon a consideration of all the evidence, whether the Defendant was a victim of repeated physical and psychological abuse by the victim, and if so[,] whether she suffered from battered spouse syndrome.

In the immediately following third paragraph, the trial court instructed the jury on what to do if it found that Elzey suffered from the Syndrome:

> If you determine that the Defendant suffered from Battered Spouse Syndrome[,] then you should consider this evidence for the purpose of explaining the Defendant's motive or state of mind, or both, and her beliefs and perceptions at the time of the commission of the alleged offense in order to determine whether the requirements of self-defense exist.

Addressing these directives in reverse order, we first observe that there was no error in the third paragraph of the Syndrome instruction in and of itself. If the jury concluded that Elzey suffered from Battered Spouse Syndrome, then it was necessary and appropriate for the jury to consider how the Syndrome affected Elzey's "motive or state of mind, or both, and her beliefs and perceptions," in examining the confrontation that left Hunter dead. The negative implication of this paragraph – that, if the jury concluded Elzey did *not* suffer from the Syndrome, the jury should not consider the evidence it had heard about the Syndrome, in assessing whether the requirements of self-defense exist – was also correct. It is not an abuse of discretion to instruct a jury that it must find a defendant was suffering from Battered Spouse Syndrome at the time of the alleged offense before considering how the Syndrome affected her state of mind in assessing the threat posed by the decedent.

24

To the extent the second part of the second paragraph instructed the jury to consider all the evidence before it – including evidence of prior abuse and Dr. Blumberg's testimony concerning such prior abuse – in determining whether Elzey suffered from the Syndrome, we also perceive no error.[10] However, the court erred when, in the first part of the second paragraph, it instructed the jury that it had to make a finding that Hunter repeatedly abused Elzey physically and psychologically before the jury could consider "all the evidence" and determine whether Elzey suffered from the Syndrome.

Noting the defense's exception to the instruction as given, the trial court explained that it declined to add "and others" after "by the victim" in the second paragraph of the Syndrome instruction. The trial court concluded that CJP § 10-916 "requires that there be a finding by the jury that this victim had engaged in repeated physical and psychological abuse of [Elzey] because otherwise . . . battered spouse syndrome doesn't apply." We agree with the Court of Special Appeals that the trial court erred in reasoning that the Battered Spouse Syndrome statute required the jury to make a predicate finding that Hunter engaged in repeated physical and psychological abuse of Elzey.

We have previously recognized that the General Assembly enacted CJP § 10-916 in response to an inconsistency that was occurring in trial courts. Prior to the enactment of

_____

[10] We assume for purposes of this section of our opinion that the second paragraph of the instruction unambiguously directed the jury to consider evidence relating to prior abuse by third parties in its determination of whether Elzey suffered from the Syndrome. However, as discussed in Section 3 below, the second paragraph can also reasonably be read to instruct the jury to consider only Hunter's abuse of Elzey, and not evidence of prior abuse, in assessing whether Elzey suffered from the Syndrome.

25

the statute, some courts admitted evidence relating to the Syndrome, while other courts did not. The General Assembly adopted CJP § 10-916 to "clarify that the court *has discretion* to admit evidence of repeated physical and psychological abuse of the defendant by the alleged victim and expert testimony on the battered spouse syndrome." *Smullen*, 380 Md. at 258; *see also* S. Judicial Proceedings Comm., Floor Report on House Bill 49, 401st Sess. (Md. 1991) ("[W]hile courts are currently permitted to admit evidence of the battered spouse syndrome, some judges will not admit it; therefore, such evidence is not admitted equally in all jurisdictions."). The statute "allows a defendant who suffered from battered spouse syndrome at the time of the offense to offer evidence of the abuse and expert testimony on the syndrome notwithstanding evidence that the defendant was the first aggressor, used excessive force, or failed to retreat at the time of the alleged offense." *Porter*, 455 Md. at 238 (cleaned up); *see also Smullen*, 380 Md. at 259 (discussing legislative intent and application of the statute). The statute imposes no requirement on a jury to make any predicate findings. Indeed, it does not address the role of the trier of fact in any respect. Rather, the statute only concerns the admissibility of evidence of abuse and expert testimony about the Syndrome, which presents a question of law that is solely for the trial court to decide.

Although the State recognizes that CJP § 10-916 does not set forth a statutory requirement that a jury make any predicate finding, the State nevertheless argues that the trial court's predicate finding requirement was a correct statement of law. Thus, the State argues that "the standard for admissibility of Battered Spouse Syndrome evidence is the

26

same as the standard for jury consideration of that evidence" with "[t]he difference [being] whose job it is to make such a finding." We disagree.

In determining the admissibility of Syndrome evidence under CJP § 10-916, the trial court does not make a "finding" that the victim, in fact, repeatedly abused the defendant. Rather, the trial court makes a finding that the defendant has "raise[d] the issue" that she was suffering from the Syndrome at the time of the charged offense as a result of the past course of conduct of the victim. CJP § 10-916(b). Here, it is undisputed that Elzey sufficiently raised the issue that she suffered from the Syndrome for purposes of § 10-916. And, as *Wallace-Bey* explains, evidence of prior abuse can be relevant to the determination whether a defendant suffered from Battered Spouse Syndrome at the time of the alleged offense. 234 Md. App. at 549-50.

Notably, the State does not contend that the trial court erred in admitting the evidence of past abuse by third parties or Dr. Blumberg's expert testimony based on that evidence. The trial court admitted all of this evidence to assist the jury in determining whether Elzey was suffering from the Syndrome at the time of the alleged offense. However, by requiring the jury to find that Hunter repeatedly abused Elzey physically and psychologically before the jury could consider whether Elzey suffered from Battered Spouse Syndrome,[11] the trial court left open the possibility that the jury would never

---

[11] Recall that the trial court instructed the jury: "You must determine, based upon a consideration of all the evidence, whether the Defendant was a victim of repeated physical and psychological abuse by the victim, *and if so[,]* whether she suffered from battered spouse syndrome." (Emphasis added.)

27

consider Dr. Blumberg's opinion that Elzey suffered from the Syndrome. In so doing, the court failed to follow the reasoning of the Court of Special Appeals' persuasive opinion in *Wallace-Bey* to its logical conclusion.

As discussed above, the *Wallace-Bey* Court explained that "Wallace-Bey's exposure to traumatic experiences, including childhood sexual abuse, was a cornerstone of Dr. McGraw's conclusion about how battered spouse syndrome affected Wallace-Bey's actions during the shooting." *Wallace-Bey*, 234 Md. App. at 549. Among other things, the court pointed to Dr. McGraw's opinion that "persons with long histories of trauma respond to threats in the context of the sum total of their total traumatic life experiences and that the cumulative effect of violence can severely alter a person's ability to cope with a threat." *Id.* at 549-50 (cleaned up). The court further explained that

> the components of Dr. McGraw's report that discuss Wallace-Bey's history of other abuse pertain to the two aspects of battered spouse syndrome (learned helplessness and heightened sensitivity) that are most probative to the elements of perfect and imperfect self-defense. Information about that prior abuse could have assisted the jury in evaluating the validity and probative value of Dr. McGraw's opinion.

*Id.* at 550.

The trial court in Elzey's case recognized that *Wallace-Bey* allowed Elzey to introduce evidence of the abuse she suffered prior to her relationship with Hunter, and to elicit expert testimony from Dr. Blumberg concerning the effect of such prior abuse on Elzey's development of the Syndrome. Thus, the court properly admitted Elzey's testimony concerning abuse by her prior intimate partners and also properly admitted Dr. Blumberg's testimony concerning the effect of that abuse (and abuse Elzey suffered during childhood)

28

on Elzey's state of mind. However, the trial court erred by creating an obstacle to the jury's use of that evidence in determining whether Elzey suffered from the Syndrome.

The State has not directed us to any authority that supports the trial court's predicate finding requirement.[12] To put a finer point on it, the State has cited no authority in Maryland or elsewhere that approves of a trial court limiting a jury's use of expert testimony in deciding the question as to which the expert testimony was admitted to assist the jury.

Dr. Blumberg's evaluation of Elzey revealed that she was suffering from severe PTSD at the time of Hunter's killing, as well as depression and other mental disorders. Based on the totality of her psychological profile, which included childhood abuse and abuse by three intimate partners during Elzey's relatively short period of adulthood, Dr. Blumberg opined that, at the time of the alleged offense, Elzey's profile was "consistent with an individual suffering from the battered spouse syndrome." It is difficult to fathom

---

[12] We are not persuaded by the State's analogy to the pattern jury instruction on flight or concealment. That instruction tells the jury that it "must first decide whether there is evidence of flight [concealment]." If the jury concludes there is evidence that the defendant fled (or engaged in concealment) after commission of the alleged crime, then the jury "must decide whether this flight [concealment] shows a consciousness of guilt." MPJI-Cr 3:24. The State's analogy might be apt if Elzey were challenging the third paragraph of the trial court's instruction, in which the court informed the jury: "If you determine that the Defendant suffered from battered spouse syndrome[,] then you should consider this evidence for the purpose of explaining the Defendant's motive or state of mind, or both, and her beliefs and perceptions at the time of the commission of the alleged offense in order to determine whether the requirements of self-defense exist." Elzey is not challenging that portion of the Syndrome instruction, which we have already observed is not erroneous in and of itself. Rather, Elzey ascribes error to the second paragraph of the instruction, in which the trial court required the jury to make a predicate finding that could potentially exclude some of the admitted evidence on Battered Spouse Syndrome from the jury's consideration.

how the jury could properly assess whether Elzey suffered from Battered Spouse Syndrome if it did not consider all the evidence that it had before it on this subject. *See Singleton v. Roman*, 195 Md. 241, 247 (1950) ("[A]n instruction is erroneous if it withdraws from the consideration of the jury any evidence, however weak, tending to establish material facts."); *Bentley v. Carroll*, 355 Md. 312, 331 (1999) ("To the extent that the court's instruction rendered all non-expert evidence irrelevant to the issue of causation, the jury was misguided in its task, and the court erred."); *Kennelly v. Burgess*, 337 Md. 562, 574 (1995) (holding an instruction erroneous because it "served to negate the potential evidentiary value" of certain evidence). Yet the trial court's predicate finding instruction created the possibility that such a scenario would occur.

It appears that the trial court required the jury to make a predicate finding that Hunter repeatedly abused Elzey because it was persuaded by the prosecutor's argument that Elzey "is not allowed to murder her current boyfriend because four boyfriends ago beat her up." But this position is inconsistent with the General Assembly's intent, expressed in CJP § 10-916, to permit expert testimony that explains the complexity of the Syndrome, in which past trauma may impact a person's response to current trauma, thereby assisting jurors in their assessment of a seemingly counter-intuitive set of facts.[13]

---

[13] We are not presented here with the hypothetical case that Judge McDonald raises in his concurring opinion, *i.e.*, a case that does not involve evidence of past abuse by the victim of the alleged offense. Thus, we do not address whether a defendant, who does not claim that she was suffering from Battered Spouse Syndrome as the result of the past course of conduct of the victim, may nevertheless introduce evidence of prior abuse by other intimate partners and offer expert testimony on the Syndrome to assist the trier of fact in evaluating a claim of self-defense.

Now recognizing the relevance of evidence of past abuse to a diagnosis of Battered Spouse Syndrome, in its reply brief the State argues that the second paragraph of the instruction was not erroneous because it "left room for the jury to find that Elzey was the subject of repeated abuse by the victim, but not sufficient repeated abuse to, in and of itself, cause the characteristics of Battered Spouse Syndrome." In that scenario, the State continues, the jury would then consider "all the evidence" to determine whether Elzey suffered from the Syndrome, which would include evidence of the decedent's abuse *and* prior abuse by third parties.[14]

This argument further exposes the error of the trial court's predicate finding requirement. In the State's hypothetical, the jury would consider evidence of Hunter's abuse for a second time (as part of its consideration of "all the evidence" to determine if Elzey suffered from Battered Spouse Syndrome), rendering superfluous its first review of Hunter's abuse. If the jury was permitted to find that Elzey developed Battered Spouse Syndrome based on Elzey's entire history of abuse, there was no need for the jury first to consider separately whether Hunter repeatedly abused Elzey physically and

---

[14] The State's position on this point is inconsistent with the prosecutor's closing argument at trial, in which she told the jury: "When you're considering battered spouse syndrome you must base your decision on whether the Defendant was the victim of repeated physical and psychological abuse by Migail Hunter, not anybody else, by Migail Hunter. Why? Because a prior, terrible, horrible, awful upbringing and relationships, all of that doesn't mean at age 26, several years later, you're allowed to murder an innocent man. He has to have been the one who was causing such repeated physical and psychological abuse that it [led] to this." *See also* section 3 below.

31

psychologically, in connection with its determination whether Elzey suffered from the Syndrome.

An instruction does not properly state the law where it calls for the jury to conduct a superfluous preliminary review of only a portion of the evidence that is relevant to a fact the jury must determine, and to make a superfluous finding of fact. Such a detour improperly invites the jury to ascribe greater importance to some evidence compared to other evidence. It is the jury's province to consider all the evidence bearing on any particular fact and to determine the weight, if any, to give to each piece of evidence. *See, e.g.*, *Estate of Blair v. Austin*, 469 Md. 1, 17-18 (2020); *Atkins v. State*, 421 Md. 434, 453-54 (2011). The trial court should not take any action – in a jury instruction or otherwise – that effectively results in the court putting its thumb on that scale. *See Atkins*, 421 Md. at 453 ("[T]he high and authoritative position of the trial judge necessitates that the judge be more vigilant and careful in refraining from commenting on inferences to be drawn by the jury.") (cleaned up).

In sum, in a case where there is evidence that the defendant was abused by one or more third parties before the decedent allegedly abused her, and an expert opines that all of the defendant's abusive relationships contributed to her development of Battered Spouse Syndrome, a trial court may not instruct the jury to make a predicate finding that the decedent repeatedly abused the defendant, before the jury may consider all the evidence that goes to whether the defendant was suffering from the Syndrome at the time of the alleged offense. Because the trial court's instruction told Elzey's jury to make such a

predicate finding before considering all the evidence bearing on whether Elzey suffered from the Syndrome, it was erroneous.

3. The Juror Confusion Issue

In addition to discerning error in the trial court's predicate finding requirement, the Court of Special Appeals held that the Syndrome instruction also was erroneous for a second reason: it "sent mixed messages to the jury." *Elzey*, 243 Md. App. at 439. Specifically, the instruction "was unclear and potentially misleading as to what, if any effect past abuse may have had on [Elzey's] state of mind, even though the court had admitted [Dr. Blumberg's] testimony on her past abuse and its effect on her state of mind." *Id.* We agree with the Court of Special Appeals that the instruction was fatally ambiguous.

Jury instructions serve three general purposes: to aid the jury in understanding clearly the case, to provide guidance for the jury's deliberations, and to help the jury to arrive at a correct verdict. *Preston v. State*, 444 Md. 67, 82 (2015). "Jury instructions direct the jury's attention to the legal principles that apply to the facts of the case." *Id.* (quoting *General v. State*, 367 Md. 475, 485 (2002)). Confusing language in a jury instruction is grounds for reversal. *Smith v. State*, 403 Md. 659, 663 (2008) (quoting *Midgett v. State*, 216 Md. 26, 41 (1958)).

For convenience, we restate the three paragraphs of the trial court's instruction on the Syndrome, in pertinent part:

> Ladies and gentlemen, you have heard evidence that the Defendant was a victim of repeated physical and psychological abuse. You have also heard from an expert witness that a person who is a victim of repeated physical and psychological abuse by a victim may suffer from a psychological condition called battered spouse syndrome. You have also heard expert testimony that

33

the Defendant exhibits the characteristics consistent with battered spouse syndrome.

You must determine, based upon a consideration of all the evidence, whether the Defendant was a victim of repeated physical and psychological abuse by the victim, and if so[,] whether she suffered from battered spouse syndrome.

If you determine that the Defendant suffered from battered spouse syndrome[,] then you should consider this evidence for the purpose of explaining the Defendant's motive or state of mind, or both, and her beliefs and perceptions at the time of the commission of the alleged offense in order to determine whether the requirements of self-defense exist.

The first sentence of the first paragraph was a correct summary of the evidence the jury had heard. Notably, the first sentence did not focus the jury only on evidence relating to Hunter's alleged abuse of Elzey. However, in the next sentence of the first paragraph, the trial court characterized Dr. Blumberg's testimony as stating that "a person who is a victim of repeated physical and psychological abuse *by a victim* may suffer" from Battered Spouse Syndrome. (Emphasis added.) By focusing the jury on Hunter's alleged abuse in this sentence, the trial court arguably invited the jury (contrary to the implication of the preceding sentence) to discount Dr. Blumberg's testimony concerning the effect of abuse Elzey allegedly experienced in childhood, and in prior intimate relationships, on her development of the Syndrome.

The trial court muddied the waters further in the first part of the second paragraph, when it required the jury to make, at best, a superfluous predicate finding that Hunter repeatedly abused Elzey physically and psychologically before it could consider evidence of past abuse in connection with Elzey's development of Battered Spouse Syndrome. This again emphasized Hunter's alleged abuse and deemphasized the alleged abuse that Elzey

34

suffered at the hands of others, despite the fact that Dr. Blumberg ascribed importance to all of the alleged abuse in Elzey's development of the Syndrome.

In the second part of the second paragraph, the trial court instructed the jury – if (and only if) it first determined that Hunter repeatedly abused Elzey physically and psychologically – to consider whether Elzey suffered from the Syndrome. Specifically, the court instructed the jury to "determine, based upon a consideration of all the evidence, whether [Hunter repeatedly abused Elzey], *and if so[,] whether she suffered from battered spouse syndrome."* (Emphasis added.)

In the preceding section of this opinion, we assumed that the second paragraph of the instruction directed the jury to consider "all the evidence" – including evidence of prior abuse in Elzey's childhood and at the hands of prior intimate partners and Dr. Blumberg's opinions concerning the totality of Elzey's history of abusive relationships – in determining whether Elzey suffered from the Syndrome.[15] However, the "and if so" clause may have led the jury to believe that they were permitted to consider only Hunter's abuse in determining whether Elzey suffered from the Syndrome. Indeed, the first part of the second paragraph is not superfluous only if "and if so" is read to require the jury to find that Hunter's abuse, in and of itself, caused Elzey to suffer from the Syndrome. On that reading of the second paragraph, the jury must consider "all the evidence" only in deciding whether

---

[15] That seems to have been the trial court's intent. In response to defense counsel's exception, the court noted the second paragraph's reference to the jury's "consideration of all the evidence" in determining whether Elzey suffered from the Syndrome, and stated: "My understanding is that we heard the testimony of other acts of abuse in aiding us in deciding whether she suffered from battered spouse syndrome."

35

Hunter abused Elzey. That is what the prosecutor argued in her closing argument when she told the jurors that Hunter's alleged abuse had to have caused Elzey to develop the Syndrome, and that they should ignore evidence of past abuse by others.

A reasonable juror could have interpreted the second part of the second paragraph in either of the two ways we have discussed. In short, the second paragraph of the instruction is ambiguous in instructing the jury how it should determine whether Elzey suffered from the Syndrome at the time of Hunter's killing.

If the jury interpreted the second paragraph of the instruction to require it to consider only Hunter's alleged abuse in determining whether Elzey suffered from the Syndrome, the jury also may have interpreted "this evidence" in the first sentence of the third paragraph to refer only to Hunter's repeated abuse and its contribution to Elzey's development of Battered Spouse Syndrome. On the other hand, the jury perhaps could have read the third paragraph to mean that, if it got that far in the analytical process, it was permitted at that point to consider Dr. Blumberg's testimony, in full, in assessing how the Syndrome affected Elzey's state of mind and her beliefs and perceptions at the time of Hunter's killing. Again, both interpretations are plausible.

As discussed above, under *Wallace-Bey*, the trial court properly admitted evidence of Elzey's past abuse, as well as Dr. Blumberg's expert opinions, which were based, in significant part, on that past abuse. All of the alleged abuse was relevant to the jury's determination whether Elzey suffered from the Syndrome and, if so, how that psychological condition affected her perception of the threat that Hunter presented and, ultimately, the viability of her self-defense claim. However, as the Court of Special

36

Appeals aptly stated, the trial court gave the jury "mixed messages" about the relevance of Elzey's prior abuse to its deliberations. This was error. *See, e.g.*, *Midgett*, 216 Md. at 40 (reversing conviction where trial court's reference in instruction to an alternative statutory element not charged in the indictment "could have the effect of misleading and confusing the jury").

**B. The Erroneous Jury Instruction Was Not Harmless Beyond a Reasonable Doubt.**

The Court of Special Appeals held that the two errors in the jury instruction on Battered Spouse Syndrome were not harmless beyond a reasonable doubt. *Elzey*, 243 Md. App. at 439-40. The State disagrees, arguing that any instructional error was necessarily harmless because the jury acquitted Elzey of the murder and first-degree assault charges and convicted her only of the manslaughter, second-degree assault, and reckless endangerment charges. The State contends that, because the jury's verdict shows that it concluded Elzey acted in imperfect self-defense, any error in the Syndrome instruction regarding how the jury was to factor in evidence of prior abuse must have had no effect on the verdict:

> If the jury found that Elzey had not suffered a repeated cycle of physical or psychological abuse at the hands of Hunter, but was suffering from Battered Spouse Syndrome based on past abuse perpetrated by other people, the only relevance that testimony about the syndrome could have had was with regard to imperfect self-defense. In other words, a defendant whose victim had not inflicted repeated abuse, and had not created learned helplessness and a heightened awareness of danger, could not harbor a reasonable belief that she was in immediate danger and had to use deadly force to defend herself in a situation that did not appear imminently threatening. The only thing that the defendant could use Battered Spouse Syndrome evidence to show was that she subjectively, but unreasonably, believed she was in danger.

. . . If the court erred by not instructing the jury that it could consider the expert testimony on Battered Spouse Syndrome even if it did not believe that Hunter subjected Elzey to repeated abuse and even if it did not believe that Elzey suffered from Battered Spouse Syndrome, that error was harmless. Elzey received all to which she would have been entitled under that—the jury found that she acted in imperfect self-defense and the murder was mitigated to manslaughter.

We disagree with the State. Although it does appear from the verdict that the jury concluded Elzey acted in imperfect self-defense, the State has not convinced us that, if the jury had received a proper jury instruction on the Syndrome, the jury necessarily would have reached the same verdict. We can imagine at least two possible scenarios in which the jury would have found that Elzey acted in perfect self-defense if the trial court had properly instructed the jury.

First, without any consideration of the Syndrome evidence, the jury might have found that Elzey did not initially intend to harm Hunter when she brought the knife back into the living room during her argument with the six-foot, two-inch Hunter. The jury further could have found that, after Hunter approached Elzey despite seeing the knife, and told her, "[y]ou're going to have to use that knife," and "[t]hat knife does not scare me," Elzey honestly (but unreasonably) believed that Hunter was about to try to disarm her and then use the knife on her, or otherwise seriously harm her. In this scenario, Elzey's intentional moving of the knife upward when Hunter came within arm's length could form the basis for a voluntary manslaughter conviction. If the jury had been properly instructed, it might have considered and credited Dr. Blumberg's testimony that Elzey suffered from the Syndrome, and concluded that Elzey had a heightened ability to sense that the confrontation with Hunter was escalating and, therefore, that she reasonably believed that

38

"things [were about] to happen." If it so concluded, the jury might have determined that Elzey's belief that she was in imminent danger was not only honest, but also was reasonable.

Second, the jury might have found that Elzey suffered from the Syndrome, but only after considering Hunter's abuse, and disregarding evidence of Elzey's history of prior abuse. If so, the jury apparently concluded that her yearlong abusive relationship with Hunter led Elzey honestly to believe that Hunter posed a serious threat to her, but that Elzey unreasonably gauged the seriousness of that threat. However, if the jury had been properly instructed, it would have considered Dr. Blumberg's testimony about Elzey's long history of abuse and factored that into its assessment of Elzey's mental state and her ability to perceive when "things are going to happen." In that scenario, the jury might have concluded, based on Dr. Blumberg's testimony, that Elzey's long history of trauma at the hands of multiple intimate partners enabled her to interpret Hunter's intentions accurately, as he approached her and told her she would need to use the knife.

In sum, we are unable to say that the instructional error in this case "in no way influenced the verdict." *Harris v. State*, 458 Md. 370, 414 (2018) (internal quotation marks and citation omitted). Thus, we must reverse Elzey's convictions and remand for a new trial.[16]

---

[16] To the extent it may be helpful on remand, we observe that the first paragraph of the instruction proposed by the defense in this case, *see* page 8 above, is a good starting point for a case in which an expert witness has opined that the decedent's abuse, as well as past abuse by others, contributed to the defendant's development of Battered Spouse Syndrome.

## IV

## Conclusion

When a defendant has introduced evidence that she was abused both by the victim and by one or more other individuals prior to the victim, and her expert witness has opined that the prior abuse as well as the victim's abuse contributed to the defendant's development of Battered Spouse Syndrome, a trial court must take care not to emphasize any of the allegations of abuse over the other allegations of abuse when it instructs the jury about the Syndrome. It is up to the jury to weigh all the evidence of abuse, as well as the expert testimony discussing such abuse, and determine whether the defendant suffered from Battered Spouse Syndrome and, if so, how that condition affected her perception of the threat posed by the victim.

In Elzey's case, the trial court erred in its instruction because it required the jury to find that Hunter repeatedly abused Elzey, before the jury could consider all the evidence – including evidence of alleged prior abuse – upon which Dr. Blumberg relied in reaching his opinion that Elzey suffered from the Syndrome. In addition, the instruction was ambiguous regarding the relevance of evidence of past abuse to the jury's assessment of whether Elzey suffered from the Syndrome. Because these errors were not harmless beyond a reasonable doubt, we affirm the judgment of the Court of Special Appeals and remand this case to the Circuit Court for Wicomico County for a new trial.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED AND CASE REMANDED TO THE CIRCUIT COURT FOR WICOMICO COUNTY FOR A NEW TRIAL; COSTS TO BE PAID BY WICOMICO COUNTY.**

40

Circuit Court for Wicomico County
Case No. C-22-CR-17-000393
Argued: October 1, 2020

IN THE COURT OF APPEALS

OF MARYLAND

No. 3

September Term, 2020

STATE OF MARYLAND

v.

LATOYA BONTE ELZEY

Barbera, C.J.,
McDonald
Hotten
Getty
Booth
Biran
Battaglia, Lynne A.
(Senior Judge, Specially
Assigned),

JJ.

Concurring Opinion by McDonald, J.,
which Booth, J., joins.

Filed: January 29, 2021

The Majority Opinion is well written and I can subscribe to most of it without reservation. I write to provide my perspective on how Maryland Code, Courts & Judicial Proceedings Article ("CJ"), §10-916 should be applied.

The statute provides, in relevant part:

(a)(2) "Battered Spouse Syndrome" means the psychological condition of a victim of repeated physical and psychological abuse by a spouse, former spouse, cohabitant, or former cohabitant …

(b) Notwithstanding evidence that the defendant was the first aggressor, used excessive force, or failed to retreat at the time of the alleged offense, when the defendant raises the issue that the defendant was, at the time of the alleged offense, suffering from the Battered Spouse Syndrome as a result of the past course of conduct of the individual who is the victim of the crime for which the defendant has been charged, the court may admit for the purpose of explaining the defendant's motive or state of mind, or both, at the time of the commission of the alleged offense:

(1) Evidence of repeated physical and psychological abuse of the defendant perpetrated by an individual who is the victim of a crime for which the defendant has been charged; and

(2) Expert testimony on the Battered Spouse Syndrome.

CJ §10-916.

This statute requires some effort to parse, as it uses the word "victim" in one place to mean the defendant and, in other places, to mean the decedent. In the present case, the

"defendant" is, of course, Ms. Elzey; the decedent – *i.e.*, the "individual who is the victim of a crime for which the defendant has been charged" – is Mr. Hunter. Thus, as applied to this case, the operative part of the statute provides:

(b) Notwithstanding evidence that [Ms. Elzey] was the first aggressor, used excessive force, or failed to retreat at the time of the alleged offense, when [she] raises the issue that [she] was, at the time of the alleged offense, suffering from the Battered Spouse Syndrome *as a result of the past course of conduct of [Mr. Hunter]*, *the court may admit* for the purpose of explaining [Ms. Elzey]'s motive or state of mind, or both, at the time of the commission of the alleged offense:

(1) Evidence of repeated physical and psychological *abuse of [Ms. Elzey] perpetrated by [Mr. Hunter]*; and

(2) Expert testimony on the Battered Spouse Syndrome.

(emphasis added).

On its face, the statute appears to give the trial court the option of admitting evidence of the Syndrome if there was evidence of past abuse of Ms. Elzey by Mr. Hunter. However, case law has added judicial gloss to the plain language of the statute. Although the statute states that the trial court "may admit" evidence of the Syndrome, this Court has held that, if an adequate foundation for admission of the evidence is established, a trial court "must admit" it. *State v. Smullen*, 380 Md. 233, 261 n.8 (2004). In addition, although the statute does not refer to past abuse of the defendant by anyone other than the decedent, the Court of Special Appeals has indicated that evidence of past abuse of the defendant by others

2

could be "admissible under some other provision or theory of relevance." *Wallace-Bey v. State*, 234 Md. App. 501, 549-50 (2017).

Here it is evident from the record that the trial judge did not take this issue lightly. She read the statute carefully, consulted *Smullen* and *Wallace-Bey*, and properly admitted evidence of the Syndrome after doing so, in light of the evidence of past abuse of Ms. Elzey by Mr. Hunter. When it came time to devise jury instructions, she adapted the one model instruction available to her (although it appears that the instruction had not been updated since the *Wallace-Bey* decision). Ordinarily, this would easily pass the usual "abuse of discretion" test on appellate review, but the Court holds that a legal error infected the instruction that was given. I agree. It seems to me that the root of the problem here is, as Judge Raker indicated in her opinion for the Court of Special Appeals in this case, that the statute – and the subsequent judicial gloss on the statute – relates more to the trial judge's decision in admitting evidence than to the jury's decision in weighing that evidence.[1] Once a trial judge has made the decision to admit evidence, it seems confusing, at best, to effectively ask the jury to re-visit that decision in its deliberations in considering a claim of self-defense.

In this case, it was appropriate to admit the evidence of the Syndrome under CJ §10-916 in light of the evidence of past abuse of Ms. Elzey by Mr. Hunter and to allow the jury to consider that evidence in connection with her claim of self-defense, along with her

---

[1] 243 Md. App. 425, 438-39 (2019).

denials of agency in the death of Mr. Hunter.[2]  In my view, the trial judge was correct, at least with respect to a claim of self-defense, when she stated that "if the individual who has died didn't abuse you in any way, I don't think you are allowed to invoke the [Syndrome]." In a case that did not involve evidence of past abuse by the decedent, evidence of the Syndrome would appear to be more pertinent to a plea of "not criminally responsible"[3] than to a claim of self-defense.

Judge Booth has advised that she joins this opinion, as well as the Majority Opinion.

---

[2] Ms. Elzey had provided three different versions of the events of that evening.  In her conversation with the 911 operator and her initial statement to the police, she did not admit involvement in Mr. Hunter's death.  Even in the third version, which she gave at trial, she insisted that she had not stabbed him, but that he had walked or fallen onto a knife she was holding.

[3] *See* Maryland Code, Criminal Procedure Article, §3-109 *et seq*.; Maryland Rules 4-242(a), 4-314.