775 A.2d 1249

Janet KATSENELENBOGEN

v.

Sergey KATSENELENBOGEN.

No. 139, Sept. Term, 2000.

Court of Appeals of Maryland.

July 13, 2001.

Lisae C. Jordan (Bobbie G. Steyer of House of Ruth, on brief), Baltimore, for petitioner.

Henry Weil (Stuart H. Grozbean of Belli, Weil & Grozbean, P.C., on brief), Rockville, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

WILNER, Judge.

This is a domestic violence case in which the Court of Special Appeals vacated a protective order entered by the Circuit Court for Montgomery County and remanded the matter for further consideration of whether the order was appropriate. The case is now moot, as the protective order at issue expired, by its own terms, on January 3, 2001.

 The concern expressed by petitioner is that both the holding of the intermediate appellate court and some of the language used in its reported opinion, *Katsenelenbogen v. Katsenelenbogen*, 135 Md.App. 317, 762 A.2d 198 (2000), can be construed as weakening the State's effort to respond aggressively to incidents of violence in the home and frustrating the important objectives of the State's domestic violence law. As noted in *Coburn v. Coburn*, 342 Md. 244, 250, 674 A.2d 951, 954 (1996), we will, on rare occasions, address the merits of a moot case when "we are convinced that the case presents unresolved issues in matters of important public concern that, if decided, will establish a rule for future conduct." That is the situation here.

## BACKGROUND

The incident that gave rise to this proceeding occurred on January 1, 2000. The parties had been married since 1986 and had three children, ages 8, 9, and 12. They lived in a single family home in Potomac. Respondent husband is em-

ployed full-time as an engineer; petitioner wife is a nurse who, because of a back problem, was able to work only three days—24 hours—a week. As a further consequence of her back problem, wife hired a live-in nanny to help with the children and various household chores.

By the time of the altercation on New Year's Day, the marriage was obviously in deep trouble. Both parties agree that wife had asked husband to leave the home. Husband said that, in December, his wife admitted to him that, while he was away on a business trip, she had brought another man into the home and had sexual intercourse with him, that she had consulted an attorney, and that she intended to divorce him. Wife denied the affair but acknowledged that she had informed her husband that the marriage was over. She said that she wanted him to leave because "he was disruptive to the children" and was "behaving inappropriately in front of them."

The genesis of the January 1 incident was husband's instruction to the nanny that she was fired and would have to leave the home at once. Husband said that, in light of his wife's confession of infidelity, he was unwilling to continue occupying the marital bedroom and that he needed the nanny's room. Whether he truly needed the room she was occupying was one of the matters in dispute. When informed by the nanny of her discharge, wife called her attorney and was advised that, as wife had hired and was paying the nanny, husband had no right to discharge her and force her to leave the marital home. With the benefit of that advice, wife confronted her husband in their bedroom and informed him that the nanny was going to stay, which led to an argument over the matter. Husband picked up their cordless telephone and began walking down the stairs. Wife followed him and continued to follow him despite his request that she "get away from him." Wife said that he was calling the police and that she wanted to hear what he was saying. She overheard him say that he had an employee in the house whom he had fired but who was refusing to leave, and that he wanted the police to come and remove her from the house. She heard him add, "Please come quickly because the situation could escalate, and

there could be some possible violence." Wife said that she took that to be a threat.

When the pair reached the foyer, their nine-year old son, Alexander, joined them. Husband, still on the telephone, exited the house. Wife continued to follow him down the driveway, demanding that he give her the telephone. He said that he would give it to her when he was finished. At the time, she claimed, he was shouting profanities at her. When he completed his call to the police, he made another call, apparently to his mother, and began speaking in Russian, which wife did not understand. She continued to demand that he give her the telephone. At that point, according to wife, husband, holding the phone in his right hand, put his left hand on her shoulder and shoved her, which "set her off balance." Alexander then "dove in between us," she said, and husband shoved him out of the way. With Alexander, wife ran to a neighbor's house and called the police. After the police arrived and interviewed the witnesses, wife packed some clothing and she and the children went to stay, temporarily, with her mother. There is no evidence that wife, or Alexander, required any medical treatment. She said that she felt faint at one point and was offered an ambulance, but she declined.

Two days later, wife filed in the Circuit Court for Montgomery County a petition for protection from domestic violence, alleging some of the facts as set forth above. The court entered an immediate *ex parte* order in which it found reasonable grounds to believe that (1) wife was a person eligible for relief, (2) husband committed an act that placed her in fear of imminent serious bodily harm, and (3) the act having that effect was that "Respondent shoved petitioner." Upon those findings, the court directed husband to vacate the marital home and to refrain from abusing or contacting wife, awarded custody of the children to wife, and set a hearing on the matter for January 10. Pursuant to that order, wife resumed occupancy of the marital home.

Through the checking of boxes on the pre-printed petition form, wife contended that the acts of abuse perpetrated against her consisted of shoving, threats of violence, and mental injury of a child. She asked for a panoply of relief, including continued possession of the marital home, to the exclusion of husband, emergency maintenance to be paid by husband, and an order that husband have no contact with her or the children. At the hearing on January 10, wife acknowledged that husband had not struck her prior to the incident on January 1. Nor did she present any evidence that he had ever attempted or threatened to strike her. She stated that he had "displayed violent behavior and anger control problems" in the past, however, and described one incident in which, in a failed attempt to kick the family dog, he put a hole in the wall. Without explaining the specific circumstances of their creation, she added that there were "several holes in the wall." She stated further that husband had used profanity in front of the children and that he had "exhibited anger and threatened to throw things against the wall in front of the children." Finally, she said that, at the time of the January 1 incident, respondent's breath was "reeking" from alcohol. Husband denied having shoved his wife and son, and he also denied that he had been drinking. Although Alexander was apparently brought to the courthouse, he was not called to testify.

On this evidence, supplemented by evidence of the parties' respective financial situations, the court found that "there is a volatile situation here," although it did not know the cause of that situation—whether "it is the extra-marital affair or if it is the alcoholic consumption"—and that "these folks should be separated." The court was "convinced" that wife was shoved and decided, therefore, to grant the protective order. The order, which ran for the better part of a year, until January 3, 2001, afforded nearly all of the relief requested by wife. Among other things, it directed that husband vacate the family home and not return, that he not contact wife in any way, except for visitation with the children, that he not abuse or threaten to abuse the wife, and that he pay emergency family maintenance to wife in the amount of $2,000/month.

The order awarded sole custody of the three children to wife, subject to liberal visitation "without consumption of alcohol," and awarded her as well exclusive use and possession of one of the two family cars.

Obviously anticipating further litigation regarding the dissolution of the marriage, which it suggested be "filed immediately," the court stated:

> "This has no bearing on the final outcome of this case whatsoever. This is merely a band-aid attempt to separate these folks so nobody gets hurt, but it is not a situation where Mr. Katsenelenbogen is going to lose everything or whatever as a result of this hearing because I am going to put on here that it is without prejudice and should not have any bearing on the ultimate decision as to the merits hearing, both on the monetary and the award of custody."

In the actual protective order, the court stated, as part of the visitation provision, that "[t]his is without prejudice to respondent to seek custody of children."

Husband appealed from the order, arguing to the Court of Special Appeals that (1) wife had failed to prove "abuse," within the meaning of the domestic violence law, and (2) if there was abuse, it was limited to the one "isolated and relatively non-serious" incident and that the court erred in granting, as a remedy, the maximum relief affordable under the statute. The appellate court began its opinion by recognizing the seriousness of domestic violence, both on the persons directly abused and on children in the household, and it expressed its view that, because of the widespread occurrence and frequent catastrophic effect of such violence, "preventive measures to halt the occurrence of further violence are to be applauded." *Katsenelenbogen, supra,* 135 Md.App. at 335, 762 A.2d at 207. The court also noted:

> "For those same reasons, allegations of domestic violence are very serious, and the issuance of a protective order normally carries with it grave consequences for the perpetrator. If a protective order is issued without a sufficient legal basis, those consequences frequently cannot be erased.

In that situation, the alleged perpetrator may suffer unfairly from the direct consequences of the order itself, which may include removal from his or her home, temporary loss of custody of his or her children, or temporary loss of a family car. . . . The alleged perpetrator may also suffer from the social stigma that attaches to the order."

*Id.*

Expounding on that theme, the court observed that, although domestic violence protective orders do not award permanent custody of children, they can affect ultimate custody decisions in a variety of ways. A court adjudicating the custody issue might consider the issuance of a protective order against one parent when looking at the fitness, character, and reputation of the parents; it might also consider the effect on the child of changing his or her residence; and, if the order states that a *child* was abused, the court might be required to make a specific finding that there is no likelihood of further abuse in order to award custody, or even visitation. The appellate court also noted a recent addition to the divorce law, Maryland Code, Family Law Article, §§ 7–103(a)(7) and (8), permitting as grounds for absolute divorce, without any required waiting period, cruelty of treatment or excessively vicious conduct toward the complaining party, if there is no reasonable expectation of reconciliation. The court expressed concern that the domestic violence statute "could be used to seek an advantage with respect to issues properly determined in a divorce, alimony, or custody proceeding." *Id.* at 337, 762 A.2d at 208.

■ With that introduction, the court turned to the requirements of the domestic violence statute in light of the evidence presented in this case. It noted that, under § 4–506(c) of the Family Law Article, a protective order may be issued only if at least one act of "abuse" has been established by clear and convincing evidence, and that § 4–501(b) defined "abuse," in relevant part, as (i) an act that causes serious bodily harm, (ii) an act that places a person eligible for relief "in fear of imminent serious bodily harm," (iii) assault in any degree, (iv)

rape, sexual offense, or attempted rape or sexual offense in any degree, or (v) false imprisonment. Apparently overlooking the fact that the "shoving" testified to by wife and found by the court to have occurred would constitute a second degree assault under Article 27, § 12A of the Code,[1] the court regarded as the only act of abuse at issue the placing of wife in fear of imminent serious bodily harm. As to that, the court noted that wife never testified that she was in imminent fear of serious bodily injury at the time of the January 1 incident and assumed that the trial court inferred that fact from her testimony describing the incident, "coupled with her testimony with respect to [husband's] prior behavior, particularly when under the influence of alcohol." *Id.* at 339–40, 762 A.2d at 210.

Focusing, then, on that one aspect of abuse, the court concluded that § 4–501(b)(ii) requires more than actual fear. It stated:

> "We hold that the fear must be reasonable, i.e., the conduct must be such as to cause a reasonable person under the same or similar circumstances to fear serious bodily harm. The circumstances include but are not limited to the age, intelligence, gender, health, and physical attributes of the parties."

*Id.* at 342–43, 762 A.2d at 211. In a footnote, the court added that "[i]t may be sufficient if the offending party knows of a

---

1. The court recognized that assault in any degree was included as an act of abuse but omitted to consider the battery aspect of civil and criminal assault and viewed assault only in terms of the imminent threat of harm variety. Its discussion of assault was solely in the context of whether the apprehension of immediate battery must be reasonable. For purposes of the crime of second degree assault, the term "assault" is defined in § 12(b) of Article 27 as meaning "the offenses of assault, *battery,* and assault and battery, which terms retain their judicially determined meanings." (Emphasis added). A battery is essentially an offensive, non-consensual touching—the "unlawful application of force to the person of another." *Snowden v. State,* 321 Md. 612, 617, 583 A.2d 1056, 1059 (1991). It occurs when, coupled with the touching or bodily contact, "one intends a harmful or offensive contact with another without that person's consent." *Nelson v. Carroll,* 355 Md. 593, 600, 735 A.2d 1096, 1099 (1999).

victim's particular susceptibilities and seeks to take advantage of them." *Id.* at 343 n. 2, 762 A.2d at 211 n. 2.

The court held that "[i]n this case, there is no indication that the trial court applied an objective standard, and in the absence of controlling case law, no reason to presume it did so." *Id.* at 343, 762 A.2d at 211. That, apparently, was the first basis for vacating the protective order.

The appellate court then went on to consider the relationship between the possible act of abuse committed and the remedy afforded by the trial court. Noting that the domestic violence law "was not intended as a vehicle to produce *pendente lite* orders relating to custody, support, and marital property, effective for a year," but rather "to protect victims of domestic violence," the court held that "[t]he terms and duration of an order ·... should be tailored to the facts of each case, designed to address the threat of violence and not other Family Law issues not required to be addressed to accomplish that goal." *Id.* Prior abuse and the nature and severity of abuse "may be relevant to certain types of relief," it said. *Id.* at 343, 762 A.2d at 212. On that premise, the court concluded:

"In our view, the circuit court did not attempt to tailor the order to the perceived harm, thereby inducing the parties to address separation and divorce issues in a separate action, but granted maximum relief for the maximum duration on the ground that it would be 'without prejudice.' Such an order would almost always have the effect, although unintended by the court, of giving an unfair advantage to a party in a subsequent divorce, support, or custody action. The court should carefully consider the terms and duration of the order to ensure that the resulting prejudice is justified."

*Id.*

Having concluded that there was no reason to presume that the trial court applied an objective standard to the determination of the reasonableness of any fear on the part of wife and "no indication that the court attempted to tailor the terms and duration of the order to the conduct," the Court of Special Appeals held that it could not determine the appropriateness

of the protective order. It therefore vacated the order and remanded the case for the Circuit Court to consider "whether an order is now appropriate, and, if so, its terms." *Id.* at 344, 762 A.2d at 212.

## DISCUSSION

As we observed, the protective order at issue in this case has expired, and the controversy over it, as between the Katsenelenbogens, is now moot. The Domestic Violence Clinic of the House of Ruth, which has acted as counsel to the wife and has long been an advocate for abused women, is deeply concerned over the implications of the Court of Special Appeals disposition in this case and some of the language in its opinion, however, and, on behalf of the wife, asks that we reverse the ruling of the Court of Special Appeals and clarify the standards to be applied by trial judges in dealing with domestic violence cases. Wife urges that the intermediate appellate court decision "suggests that certain types of domestic violence are permissible" and thus "will endanger victims and encourage abuse," that, in contravention of the statute, it has imposed potential harm to respondents as a "new substantive policy consideration in protective order cases," that it incorrectly analyzed both the order issued by the Circuit Court and the applicable law, and that its definition of the "reasonable person" standard to determine the reasonableness of the victim's fear is inadequate.

Some of the concern expressed by wife is semantic in nature—attacking language used by the Court of Special Appeals in its opinion; some goes more to what she perceives as an underlying "bent" or philosophy, emanating from that language, that she regards as inimical to the intent and objectives of the domestic violence law; some goes directly to the holdings by the court.

We discussed the problem of domestic violence and some of the legislative and executive responses to it in *Coburn v. Coburn, supra,* 342 Md. 244, 674 A.2d 951. We noted the widespread incidence of violent attacks, mostly against wom-

en, the fact that the problem was largely ignored until the mid-1970's, when it began to attract greater public attention, and the response of the General Assembly, commencing in 1980 with the enactment of the initial domestic violence law (Maryland Code, §§ 4–501 through 4–516 of the Family Law Article). We observed that the statute granted courts the authority to issue civil protection orders, which can prohibit a perpetrator of domestic violence from abusing, contacting, or harassing the victim, and that "[t]hrough the statute, victims of domestic abuse are offered access to the judicial system to seek emergency relief and protection from their abusers." *Id.* at 252, 674 A.2d at 955. Quoting in part from *Barbee v. Barbee*, 311 Md. 620, 623, 537 A.2d 224, 225 (1988), we stated:

> "The purpose of the domestic abuse statute is to protect and 'aid victims of domestic abuse by providing an immediate and effective' remedy. The statute provides for a wide variety and scope of available remedies designed to separate the parties and avoid future abuse. Thus, the primary goals of the statute are preventive, protective and remedial, not punitive. The legislature did not design the statute as punishment for past conduct; it was instead intended to prevent further harm to the victim."

*Coburn,* 342 Md. at 252, 674 A.2d at 955.[2]

In this light, we turn to the complaints made by wife regarding the rulings and expressions of the Court of Special Appeals.

First, she contends that the intermediate appellate court's opinion "can be read as holding that shoving one's minor child and wife are tolerable types of physical domestic violence which will not support protective orders." That reading, she suggests, can come from the fact that the appellate court

---

**2.** Although the provisions in the Family Law Article are, as stated, preventive and remedial, the Legislature has not excused the perpetrators of domestic violence from the reach of the criminal law. They are subject to prosecution for their conduct—for assault, rape and other sexual offenses, criminal homicide, kidnapping—and, indeed, for failing to comply with relief provided in a protective order. *See* Family Law Article, § 4–509(a).

vacated the protective order entered by the trial court, notwithstanding the latter's finding that husband shoved wife during a verbal argument, that he also shoved the child, and that the wife was "badly shaken" and was "afraid for her safety." We do not read the opinion as a holding that shoving one's spouse or minor child are tolerable types of physical domestic violence that will not justify protective orders, and we do not believe that the Court of Special Appeals intended any such absurd conclusion. If it had, it would have reversed the protective order outright without remand.

Wife next complains about the appellate court's concern over the impact of a protective order on the perpetrator and on issues resolvable in collateral litigation. She states that such a concern "preempts the legislature's authority and imposes a new policy consideration: protection of respondents from potential harm in future litigation" and charges that the court provided no "valid justification for elevating consideration of the potential impact on respondents." Indeed, she escalates this point to a suggestion that the opinion "reflect[s] general suspicion about the veracity of petitioners, who are primarily women" and thus "appears to have disparate impact on women in possible violation of the Equal Rights Amendment of the Maryland Constitution."

We find nothing in the opinion that could reasonably be read to reflect suspicion on the veracity of female petitioners or to have a disparate impact on women in contravention of the Maryland ERA. In considering, enacting, and periodically amending the statute, the Legislature was keenly aware that the civil remedies provided for could have a significant bearing on issues normally addressed in other, more traditional domestic relations actions, and that, as with any remedial statute, this one could be abused—that spurious claims could be filed simply to gain some tactical advantage in a subsequent, or pending, divorce, support, or child access case—and it attempted to deal with those problems in a variety of ways. Other than with the consent of the respondent, a protective order may be entered only upon a finding, by clear and convincing evidence, that "the alleged abuse" has occurred

(§ 4-506(c)(1)(ii)), and only the conduct defined in § 4-501(b) will suffice to constitute the kind of "abuse" that will justify such an order. A petition for relief must be under oath and must disclose each pending action between the parties in any court. § 4-504(b). A temporary *ex parte* order may be issued only upon a finding that there are reasonable grounds to believe that a person eligible for relief has been abused, and that order may not remain in effect for more than seven days, subject to extension by the court to effectuate service of the order. § 4-505. The law requires that a hearing be held no later than seven days after service of the temporary *ex parte* order, at which, as noted, the petitioner has the burden of showing, by clear and convincing evidence, that the alleged abuse occurred. Finally, in determining whether to order a respondent to vacate the family home, the court must consider the factors set forth in § 4-506(e), among them title to the home, the history and severity of abuse in the relationship, and the financial resources and the existence of alternative housing for the parties.

The Legislature, itself, has provided a certain balance. Without question, it has made the protection of persons who have been subjected to abuse the predominant consideration—that, indeed, is the sole and essential purpose of the statute—and it has necessarily and properly assumed that courts will treat allegations of domestic violence seriously, in conformance with the legislative policy. The Legislature has also placed some limits on the right to the relief allowed and has vested the courts with considerable discretion in fashioning an appropriate remedy upon a finding that abuse has occurred to a person entitled to relief. It has thus necessarily and properly assumed that courts will perform their traditional judicial role and hear both sides to the dispute fairly and without prejudgment.

That said, once a court has found from the evidence that abuse has occurred and that a protective order is needed to provide protection for the petitioner or other person entitled to relief, the court's focus must be on fashioning a remedy

that is authorized under the statute and that will be most likely to provide that protection. If, after considering the factors set forth in § 4–506(e), the court believes that protection of the petitioner requires that the parties be physically separated and that the respondent vacate the home, it should not hesitate to order that relief, along with any ancillary relief provided for in the statute, regardless of any potential impact on future litigation. Subject to modification of the order pursuant to § 4–507 and to further determinations made in collateral litigation, a determination either to exclude the perpetrator from the family home or permit the victim to leave the home and find other shelter will, in most instances, require the court to provide, among other things, for the temporary custody of any minor children, their support, the support of the victim, and visitation arrangements.

It is likely true, as the Court of Special Appeals noted, that the issuance of a protective order and the provision of this kind of relief in it may have consequences in other litigation. A judicial finding, made after a full and fair evidentiary hearing, that one party had committed an act of abuse against another is entitled to consideration in determining issues to which that fact may be relevant. Living arrangements established as the result of a protective order may have relevance in determining custody, use and possession, and support in subsequent litigation. That is *not* the concern of the court in fashioning appropriate relief in a domestic violence case, however. The concern there is to do what is reasonably necessary—*no more and no less*—to assure the safety and well-being of those entitled to relief. We iterate what we said in *Coburn:* "The Legislature did not design the statute as punishment for past conduct; it was instead intended to prevent further harm to the victim." *Coburn, supra,* 342 Md. at 252, 674 A.2d at 955. Courts should implement the statute accordingly.[3]

---

**3.** Wife states in her brief that, in creating the statute, the Legislature "did not leave the selection of remedies to be fashioned out of whole cloth by trial judges" and that "[j]udges are not instructed to simply

Wife next takes issue with the conclusion of the Court of Special Appeals that, when the abuse triggering a protective order is the commission of an act that places the victim "in fear of imminent serious bodily harm," the fear must be reasonable and that the standard for reasonableness is whether the conduct was "such as to cause a reasonable person under the same or similar circumstances to fear serious bodily harm." That standard, she urges, "is deeply confusing and in need of clarification by this Court." She agrees that the standard should not be an entirely subjective one, but she rejects as well a generalized objective standard—whether the conduct would cause the mythical reasonable person to have such fear. The proper standard, she urges is an individualized objective one—"a reasonable petitioner in that litigant's shoes."

We agree with wife that the proper standard is an individualized objective one—one that looks at the situation in the light of the circumstances as would be perceived by a reasonable person in the petitioner's position—although we see no confusion on that point in the opinion of the Court of Special Appeals. We dealt with this kind of issue recently in

---

identify what they believe is needed for safety and order that relief." Rather, she states, "the General Assembly identified specific remedies that help protect victims of domestic violence and directed the courts to choose from these." Narrowing that discretion even further, she urges that "when a petitioner and respondent live together, it is rarely enough to simply order abuse to stop, the abuser generally must be removed from the home and the petitioner granted its use and possession."

Section 4–506(d) states that an order "may include any or all of the following relief." That language neither precludes a court from providing other kinds of relief, if appropriate in the circumstance, nor requires a court to provide in every order all of the forms of relief specifically enumerated in § 4–506(d). Nor are we willing to establish a presumption of law that a person who has committed abuse *must* be removed from the home. In many situations, that would, indeed, be the most appropriate remedy, necessary to assure the safety of the victim or others in the household, but the Legislature has clearly not made it an absolute requisite, to be ordered in every case and to follow automatically from a finding of an act of abuse. The Legislature has expressly directed that the court consider the factors enumerated in § 4–506(e) in making that decision.

*State v. Marr,* 362 Md. 467, 765 A.2d 645 (2001), involving the standard to be applied in determining whether a criminal defendant offering the defense of self-defense had reasonable grounds to believe himself or herself in apparent or immediate danger of death or serious bodily harm. We held that an objective standard was to be applied in determining the reasonableness of the defendant's asserted belief, but we made clear as well:

"The objective standard does not require the jury to ignore the defendant's perceptions in determining the reasonableness of his or her conduct. In making that determination, the facts or circumstances *must* be taken as perceived by the defendant, even if they were not the true facts or circumstances, *so long as a reasonable person in the defendant's position could also reasonably perceive the facts or circumstances in that way.*"

*Id.* at 480, 765 A.2d at 652 (emphasis in original).

We added in *Marr* that a belief as to imminent danger "is necessarily founded upon the defendant's sensory and ideational perception of the situation that he or she confronts, often shaded by knowledge or perceptions of ancillary or antecedent events." *Id.* at 481, 765 A.2d at 652. The issue, we said, was not whether those perceptions were right or wrong, but whether a reasonable person with that background could perceive the situation in the same way.

■■■ We believe that to be the proper test to be applied in this context as well. A person who has been subjected to the kind of abuse defined in § 4–501(b) may well be sensitive to non-verbal signals or code words that have proved threatening in the past to that victim but which someone else, not having that experience, would not perceive to be threatening. The reasonableness of an asserted fear emanating from that kind of conduct or communication must be viewed from the perspective of the particular victim. Any special vulnerability or dependence by the victim, by virtue of physical, mental, or emotional condition or impairment, also must be taken into account.

Because the protective order at issue has expired and the case is moot, there is no need for us to determine the validity of the order under the principles stated in this opinion. We shall therefore vacate the judgment of the Court of Special Appeals and remand the case to that court with instructions to dismiss the appeal as moot.

JUDGMENT OF COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO DISMISS APPEAL AS MOOT; COSTS IN THIS COURT AND COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.