***Sergejs Hripunovs v. Elena Maximova***
No. 1169, Sept. Term. 2023
Opinion by Leahy, J.

**Protection of Endangered Persons > Security or Order for Peace or Protection > Proceedings > Evidence > Admissibility**

Evidence of a pattern of past abuse is highly relevant in determining the need for protection against future abuse and in determining the appropriate remedies. "Protective orders are based on the premise that a person who has abused before is likely to do so again[.]" *Coburn v. Coburn*, 342 Md. 244, 259 (1996).

**Res Judicata > Preclusion in general > Claim preclusion in general**

Under Maryland law, *res judicata* precludes a party from relitigating a *claim* when: "(1) the parties in the present litigation are the same or in privity with the parties to the earlier action; (2) the claim in the current action is identical to the one determined in the prior adjudication; and (3) there was a final judgment on the merits in the previous action." *Powell v. Breslin*, 430 Md. 52, 63-64 (2013). In the context of a hearing for a final protective order, the court was not barred under the doctrine of *res judicata* because Wife's second petition for a final protective order constituted a different cause of action.

**Res Judicata > In General > Collateral estoppel and issue preclusion in general**

Under the doctrine of collateral estoppel, an *issue* cannot be re-litigated when: (1) the issue decided in the prior adjudication is identical with the one presented in the action in question; (2) there is a final judgment on the merits; (3) the party against whom the doctrine is asserted is a party or in privity with a party to the prior adjudication; and (4) the party against whom the doctrine is asserted was given a fair opportunity to be heard on the issue. *Garrity v. Md. State Bd. of Plumbing*, 447 Md. 359, 369 (2016) (quoting *Colandrea v. Wilde Lake Cmty. Ass'n, Inc.*, 361 Md. 371, 391 (2000)). The doctrine of collateral estoppel did not preclude Wife from litigating her allegations of abuse during the underlying final protective order proceeding because she alleged, and presented evidence of, abuse that occurred since the prior proceeding.

Circuit Court for Montgomery County
Case No. C-15-FM-23-809459

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1169

September Term, 2023

_____

SERGEJS HRIPUNOVS

v.

ELENA MAXIMOVA

_____

Wells, C.J.,
Leahy,
Eyler, Deborah S.
      (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Leahy, J.

_____

Filed: September 3, 2024

* Tang, J., did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

Sergejs Hripunovs ("Husband") appeals from the entry of a final protective order in the Circuit Court for Montgomery County on the petition of his wife Elena Maximova ("Wife"). Husband argues that the circuit court erred because *res judicata* and collateral estoppel precluded Wife's claims and because the circuit court relied on prior findings of abuse when it entered a final protective order.

Husband timely filed this appeal on August 15, 2023. He presents three issues for our review, which we have consolidated and rephrased as one question: Did the circuit court err and/or abuse its discretion when it granted Wife a final order of protection?[1]

For the reasons we explain below, we hold that the trial court did not err or abuse its discretion in granting the final order of protection. We shall affirm the judgment.

## BACKGROUND

Husband and Wife were married on July 22, 2018, and have no children. The marriage has been marred with allegations of physical and emotional abuse, resulting in the issuance of multiple protective orders for both parties.[2] Relevant to this appeal, Wife

---

[1] Husband's issues presented are:

1. Whether the Circuit Court erred in entering a domestic violence protective order against Mr. Hripunovs.

2. Whether Mrs. Maximova's claims and issues were precluded and barred by *res judicata* and collateral estoppel.

3. Whether a person can keep refiling the same petition for a protective order until the desired results are obtained.

[2] For example, on May 22, 2023, Husband filed a Petition for a Protective Order in which he stated that the basis for the petition for protection was:

(Continued)

filed for an interim protective order on June 8, 2023 in the District Court of Maryland. In her petition, she stated that Husband "came home on 6/7/2023 and started severely punching, grabbing and kicking me." This interim petition for protection order was granted on the same day and later a temporary protective order was granted and extended.

On June 14, 2023, the District Court of Maryland for Montgomery County denied Wife's request for a final order of protection. On the same day, Husband filed his complaint for absolute divorce, citing adultery, cruelty of treatment and excessively vicious conduct as grounds. A two-day merits hearing for the divorce proceeding is currently scheduled for September 25 – 26, 2024.

### The First Hearing in the Underlying Protective Order

On June 19, five days after her petition for protective order in the District Court was denied, Wife filed a new Petition for Protection in the District Court of Maryland for Montgomery County.

In Wife's petition, she repeated some of the prior allegations that Husband bruised,

---

"No injuries so far, but I was thinking that she is pushing me to commit suicide. She throwed [sic] rags and small objects at me. She doesn't let me sleep, threat[en]ing to put me in jail.
* * *
It is mental abuse, and threat of putting me in jail for the things I didn't do. Also, she is calling to my clients and badmouthing me, ruining the business."

An interim protective order was granted, and the petition was dismissed the next day at Husband's request. A couple weeks later, Husband filed another petition for protection in the District Court of Maryland in which he claimed that his wife was an alcoholic and drug abuser, and stated that, "She is holusinating [sic] and she has delirium tremens. I am afraid for my life and my safety. She needs medical help asap." This temporary protective order was denied because Husband could not meet the necessary burden of proof.

2

kicked, and bit her, but she also made new allegations that Husband killed her kittens "to hurt [her] emotionally" and "[s]ometime [on] June 15th – 16th" Husband "threaten[ed] to kill [her] if she "sen[t] him back home to Latvia." Wife emphasized that her "life [wa]s in danger" and could no longer "risk [her] life and continue to live with [Husband][.]"

On June 21, the District Court granted the temporary protective order and sent Husband a copy, notifying him that, among other things, "[a] petition for protection alleges that you have committed abuse. Based on the petition and on any testimony provided at the initial hearing, the court has issued this Temporary Protective Order." The order stated that Husband shall not contact or harass Wife, and commanded Husband to vacate the marital home. The case was then transferred to the circuit court where a final protective order hearing was scheduled to be held on June 28, 2023. This temporary order was extended, and the final protective order hearing was scheduled for July 6, 2023.

On July 6, the parties appeared before the Circuit Court for Montgomery County for the hearing. Husband was represented by counsel, and Wife proceeded *pro se*. At the outset, Husband's attorney noted that there was "a hearing on a final protective order that [Wife] filed on June 14th" in the District Court of Maryland and that this petition was denied. The trial court judge instructed Wife to focus her testimony on events that occurred after June 14.

Wife testified that since the denial of the final protective order on June 14, Husband "threatened to kill [her]" and "put[] hidden cameras in the house." Wife elaborated that Husband said "[t]hat he already killed a person before, and Elena, if you send me to Latvia without [immigration paperwork] you will be the next and I will kill

3

you." Wife also asserted that "[t]he house is full of weapons" and that Husband "mak[es] weapons at home." To support her claim, Wife, to the court's disbelief, "brought weapons to the courthouse" and left them "downstairs" with the sheriff. Wife stated that she was unsure what kind of weapons Husband allegedly kept in the house, but she explained that they were "[p]arts of the weapon. Parts of the gun[]" and "bullets for sure." The Court asked Husband what types of weapons he had in the house, and Husband responded that he had parts of an AR-15 and twenty boxes of ammunition because he does "practice shooting . . . [at] his friend's farm." The judge then pointedly asked Husband:

> THE COURT: You do practice shooting with part of a gun?
>
> [HUSBAND]: No, no, no. He has guns.
>
> THE COURT: Well, why do you have part of a gun?
>
> [HUSBAND]: It's a lower receiver. Well, again, it was in two parts –
>
> THE COURT: Are you intending to build an AR-15?
>
> [HUSBAND]: I am not, Your Honor.
>
> THE COURT: So why have part of a gun?
>
>          * * *
>
> THE COURT: So you bought a part online to an AR-15 –
>
> [HUSBAND]: Yes.
>
> THE COURT: -- knowing that you can't assemble it? Right? And you have 20 boxes of ammunition for guns you don't own?

The judge again reminded Wife to focus her testimony on the events that support

4

her allegation that a sufficient act of abuse had happened since June 14. Wife explained that since June 14, Husband "killed a kitten" and "ma[de] a video of it." Wife disputed Husband's allegation that she was the one who killed the kitten and explained that, at the time, she was with clients "upstairs doing eyelash extension[s]."

The judge followed up on Wife's allegation that Husband installed cameras around their home:

[THE COURT]: Okay, so installing cameras in the house is not grounds for a domestic violence order.

[WIFE]: I understand, but he specifically beats me at the place where the cameras are not seen.

[THE COURT]: When?

[WIFE]: When? I have no –

[THE COURT]: Since June 14th?

[WIFE]: Yes. The camera –

[THE COURT]: No, no, I'm saying did he beat you since June 14th?

[WIFE]: Not physically, but he killed a kitten. Hold on a second.

[THE COURT]: Okay, he killed a kitten. That's a, okay, so he didn't beat you. The only thing he's done since June 14th is he's killed a kitten.

[WIFE]: So I was beaten for years.

[THE COURT]: Is that what you just said? I want to make sure I understood what you just said.

[WIFE]: He did not, since June 14th he did not beat me, but he threatened me to kill me.

Husband testified after Wife and claimed that two cats were dead due to Wife's

5

negligence. He denied killing the kittens. He explained that he and Wife run a cattery and sell luxury kittens. Husband elaborated that he suffered an economic loss after the death of the kittens in the amount of $4,400 because he sells the kittens for "$2,200 . . . each[.]" He denied having threatened Wife in any way and "[n]ever" threatened to kill her.

Husband accused Wife of having a drinking problem which "[a]bsolutely" had been affecting her mental state and entered a picture of "tequila in some little jars" into evidence. According to Husband, Wife hides the jars with alcohol throughout the house.

The next witness, Lynn Liss, related that she had been Wife's client for cosmetic eyelash extensions for the past ten years. She refuted Husband's claims that Wife had a substance use disorder because Wife's work with eyelash extensions is "very precise work." Ms. Liss testified that she had seen Wife "first thing in the morning. . . . and late in the evening." According to Ms. Liss, Wife's "hands are completely steady[,]" and she had "never smelled anything on her breath."

Ms. Liss also recounted that she had "seen bruises" on Wife "[w]ithin the last several weeks." The bruises were on Wife's "arm and her neck and [she] believe[d] [Wife] had pictures of that[.]" Wife presented pictures of her bruises that were taken at the hospital. The judge observed that the pictures were "dated June 8th of 2023" and asked why Wife did not present the photographs at the June 14 hearing. She responded that the pictures "were not ready" in time for the expedited hearing the "next day[.]" She also presented a report from the hospital. The court accepted the report and photographs into evidence, stating:

6

THE COURT: [T]here's documentation in there about the bruises that were observed that's consistent with the photographs she introduced. I think they have sufficient indicia of reliability. I don't think there was any, I looked at them. I don't gather from any of that that she could have made that up or that they weren't reliable. So, I'm going to receive them, along with the photographs.

Wife stated that she had more photographs of her body and a report from her doctor.[3] Husband's counsel protested and noted that he had not seen the report and pictures and needed the opportunity to review and confer with his client. Wife stated that she was "blocked" from presenting the evidence because Husband's counsel "expedited the hearing to the next day[.]"

At the conclusion of the hearing, the judge determined that he was going to "extend the order for another two weeks" so that Husband's counsel could review the new information and so that Wife could find and obtain counsel.

**The Second Hearing on the Protective Order**

Two weeks later, on July 20, 2023, the parties reconvened for the final protective order hearing before a different judge. Husband was represented by his counsel from the previous hearing, and Wife again appeared *pro se*. The court outlined the required standard for a final protective order, noting that "[i]t's a higher standard" and that the "burden of proof is by a preponderance of the evidence that abuse occurred[.]" The court explained that "abuse means any of the following acts: an act that causes serious bodily

---

[3] Wife stated that the report was from her doctor, but Petitioner's Exhibit 3 was a report from a forensic nurse examiner. The forensic nurse conducted a danger assessment and determined that Wife was a victim in "extreme danger," the highest level of danger on the assessment.

harm, an act that places a person eligible for relief in fear of imminent serious bodily harm, assault in any degree, rape or sexual offense, false imprisonment, stalking, or revenge porn."

Wife presented photographs of her bruises, marked as Petitioner's Exhibit No. 1, and explained that the abuse occurred "on the 2nd of June, 5th, 6th, and 7th" of 2023. Husband's counsel objected and stated that "[t]his is res judicata. This was decided by the District Court on June 14, and her petition for a protective order was denied on June 14th[.]" The judge asked if there was a transcript of the proceedings, to which Husband's counsel conceded that he ordered one, but the transcript was not available yet. The judge continued that she did not "have any basis to make a res judicata or a collateral estoppel finding" if she did not know what happened below.

Throughout the proceedings, Husband's counsel raised the same objection that the doctrine of *res judicata* barred Wife from raising pre-June 14 matters. The judge responded:

> Again, I'll give you a running objection to that. I mean, what I will say in response to that ongoing objection, I'm not sure that those principles apply in protective order cases, and I will note that evidence of past abuse is admissible for purposes of this protective order hearing, and so I'm going to continue to hear this sort of thing.

The court directed Wife to focus her testimony "on what kind of abuse you're saying occurred that requires a protective order." Wife explained that on May 11, 2023, Husband "grabbed [her] by two hands. . . . and start[ed] kicking[.]" According to Wife, between May 10 and May 22, he was "kicking and grabbing" her every night. Wife called the police but told the police that she was having "a panic attack, because domestic

violence abuse is a normal thing." Wife went on and described that on one occasion, she accidentally broke a clay pot that Husband's mother had given them as a wedding gift. At first, Wife stated Husband was "verbally abusive" and then, after drinking heavily, Husband broke her cat statues and "beat [her] severely." Wife stated that on June 2, she was beaten again and described it was "[m]ostly grabbing" both of her arms. Less than a week later, Husband allegedly grabbed Wife's body and "grab[bed] [her] face too and, again, talk[ed] about his immigration[.]" Wife stated that she called 9-1-1, and Husband left. When he returned, "[h]e beat . . . [her] hip, simply beat [her] with his hands." After about a week of abuse, Wife stated that she went to the hospital and was seen by "the forensic evidence specialist" who took pictures of her bruises.

Specifically addressing what had occurred since the June 14 denial of her previous petition for a final protective order, Wife described that, either on June 14 or 15, 2023, Husband threatened to kill her and said: "[I]f you will send me to Latvia without a penny, I will leave. You think you will be alive? You will be killed by my friends and his brother."

Near the end of Wife's direct examination, she stated that Husband "stalk[ed] [her] with a camera" by placing hidden cameras throughout the house. She testified she did not know the camera was there and did not know that he was taking pictures, including naked pictures, of her.

On cross-examination, Husband's counsel asked that "this stuff from June 8th, all these bruises and so on, that was before [the District Court] on June 14th[.]" Wife replied

9

that the "danger assessment was given to [her]" but the report and the photographs of the bruising were "never presented to the judge."

Husband testified that he had never threatened Wife or harmed her and that *he* was the one abused in the relationship. He stated that Wife would "get[] drunk very quick" and then "threaten [him] all the time when she's . . . drinking." Husband elaborated that Wife threatened to "put [him] in jail[,]" to get him deported, "take everything away from [him]", and that both she and her father "threaten[ed] to kill [him]." Husband stated that Wife had delusional behavior – "constantly imagining those stories" that he hit her "in her twisted mind." Husband stated that he filed a petition for a protective order to create a record of the alleged threats. He explained that Wife had "extreme aggression" and would "run out of the house [in] bare feet" and "run in the forest" barefoot. He stated that when Wife had episodes and runs into the forest, she "act[s] extremely, extremely weird, and she's in danger to herself, and sometimes [he's] afraid as well."

Husband denied ever killing a cat and noted the cats were "all under contract" and there was no economic benefit to him to kill a cat. Moreover, Husband pointed out that he "wasn't allowed in the house" between June 12 and June 14, so he had no opportunity to kill any cats.

Husband detailed a time in May when Wife was injured. According to Husband, Wife "showed up at the house completely drunk" and "smashed" into the front door and into a cast-iron statue. Husband contended that Wife "constantly [had] bruises" because she was "always drinking [and] running through the forest." He stated that he "never hit her[,]" "never threatened her with any weapons[,]" and did not own any weapons.

10

Husband called Rimma Shiptsova, Husband's sister-in-law, as a witness. Ms. Shiptsova testified that she met Wife on August 12, 2018, a few weeks after Husband's and Wife's wedding. She recounted a time when she went to dinner and spent an evening in D.C. with Husband and Wife, but Wife was "already a little bit tipsy[.]" As they were walking in D.C., Ms. Shiptsova testified that Wife "somehow tripped" and "fell exactly face down." She then relayed that Wife got into the taxi and stated "oh, I have a bruise here; [Husband], you hit me; [Husband], you hit me."

On cross-examination, Wife questioned Ms. Shiptsova's testimony in which she said that after the group went to the strip club and after Wife fell on her face because she was drunk, the group got pizza. Wife stated, "Rimma, do you know that me and [Husband] were both on constant diet and never eat pizza?" Ms. Shiptsova responded twice: "You don't look like you're on a diet." Wife responded to Ms. Shiptsova's narrative about the evening in D.C. and stated that she "never took a taxi[,]" and instead, she and Husband drove in his two-seat car into D.C.

Wife retorted that Ms. Shiptsova "was a constant client in [her] beauty salon" and "never even tipped" and never paid. Wife also asserted that she and Husband gave Ms. Shiptsova money and had "pa[id] her rent for years[.]"

## THE JUDGE'S RULING

The judge first determined that Wife was a "person eligible for relief because she's the current spouse of the respondent." The judge then evaluated whether Husband, by a preponderance of the evidence, abused Wife. The judge stated as follows:

11

I find that based on the evidence, there is a history of abuse. I'm looking specifically at Petitioner's Exhibit 1, which is a series of photographs taken on July – I'm sorry, on June 8th that show a lot of bruises. I listened to the petitioner's story about what happened. I find her story credible. I heard the respondent's response to those, that she – I think – I didn't hear much of a response about how she got these bruises except that she bruises easily, that she runs through the woods, that one time she, I think in May, she had an incident involving the statue of a bulldog. I'm looking at these pictures, and they're clearly grab marks on her arms exactly where she said the respondent grabbed her, multiple pictures that look like that.

I find that based on this evidence, there was prior abuse sometime prior to June 8th, within the time frame that the petitioner alleges. So I do find that there have been prior instances of abuse, which is admissible and relevant for the purpose of the domestic violence statutes. **Alleged prior abuse is admissible and relevant because it predicts future abuse.**

I also **find the petitioner's testimony credible that after the protective order hearing, the temporary protective order hearing, sometime around June 14th or 15th of 2023, I find her testimony credible that the respondent said that if she sends him back to Latvia without money, that he will kill her. I find that that was a credible threat, and I find that that put her in fear of imminent bodily injury.** So at a minimum, there was, there was prior abuse on – in June of 2023. There was [sic] other instances of abuse that were alleged. I'm not – I don't need to get into that for my purposes.

I did not find at all credible the testimony of Rimma Shiptsova. She clearly had animosity towards the petitioner. She gratuitously said you don't look like you're on a diet twice. She did not – I credit the petitioner's testimony about not being in a taxicab that night. I credit the petitioner's testimony about – that this witness came in multiple times for free services and that the respondent and the petitioner gave her money on several occasions, and based on what I view as obvious and clear lies by that witness, I don't believe anything that she said. So I certainly don't believe there was an incident on August 12th, 2018, where the petitioner falsely claimed that she was hit by the respondent despite having witnessed an accident. So I believe nothing that the first witness said.

* * *

So based on what I did find credible, including some – I'll mention some prior incidents of domestic violence that I found the petitioner to be credible about, including the May 10th, 2023, incident, where she went to sleep and he grabbed her by both hands and that – and that he kicked her. I find that

12

credible, and she was taken, I believe, to the hospital at that point. That seems that – the way she described the grabbing seemed consistent with the pictures that I saw as Petitioner's Exhibit 1.

I'd also note Petitioner's Exhibit 39, which is additional pictures. Again, these are not bruises that you get by falling down or by something like that. I don't think these are – there's no testimony that these are bruises that she gave herself or possibly did. I don't even know how she could do that to herself based on the angle that I see in Petitioner's Exhibits 1 and 39.

\* \* \*

I did not believe the respondent's testimony that he had never threatened to kill the petitioner and that he has never hurt or hit her. It's inconsistent with the photographs and the testimony of the petitioner that I did find credible. I don't – I didn't find his allegations that she's delusional and that things are happening that are in her imagination or that she has constantly had bruises from drinking and running through the forest – that testimony didn't ring true to me and specifically that nothing that could happen in the forest looks like the grab marks that are on her arms that was consistent with her testimony, and not just on the arms, but on her hip area and that sort of thing.

All the photographs support what she said, and I do recognize that those photographs were not available or used during the prior hearing, but again, the primary abuse that I'm looking for is the – what I believe is the threat to kill her, which I find was – put her in **fear of imminent serious bodily harm based on the prior abuse**, and again, I'm not going to get into more serious allegations of abuse.

So I'm going to grant the final protective order. I'm going to order that – I'm also going to find that he does have access to firearms based on the testimony that, of the respondent, that he has a lot of ammunition at the home[.]

The judge entered the final protective order on July 21, 2023, which stated that Wife demonstrated by a preponderance of the evidence that Husband placed her in fear of imminent danger and caused serious bodily harm, including "[a]ssault in any degree on June 14, 2023." The description of the harm on the final protective order lists "RECENT HISTORY OF PHYSICAL ABUSE AND THREAT TO KILL PETITIONER ON JUNE 14TH OR 15TH 2023."

13

Husband filed a timely appeal of the final protective order on August 15, 2023.

## STANDARD OF REVIEW

A trial court may grant a final protective order if there is a finding "by a preponderance of the evidence that the alleged abuse has occurred[.]" Maryland Code (1984, 2019 Repl. Vol., 2023 Supp.), Family Law Article ("FL"), § 4-506(c)(1)(ii). As we explained in *C.M. v. J.M.*, on appellate review of a circuit court's grant of a final protective order:

> we accept the circuit court's findings of acts, unless they are clearly erroneous. *See* Md. Rule 8-131(c) and *Barton v. Hirshberg*, 137 Md. App. 1, 21, 767 A.2d 874 (2001). We "must consider evidence produced at the trial in a light most favorable to the prevailing party[.]" *Friedman v. Hannan*, 412 Md. 328, 335, 987 A.2d 60 (2010) (quotation marks and citation omitted). We defer to the trial court's credibility determinations because it "has the opportunity to gauge and observe the witnesses' behavior and testimony during the trial." *Barton*, 137 Md. App. at 21, 767 A.2d 874 (quotation marks and citation omitted). It is "not our role, as an appellate court, to second-guess the trial judge's assessment of a witness's credibility." *Gizzo v. Gerstman*, 245 Md. App. 168, 203, 226 A.3d 372 (2020). As to the circuit court's ultimate conclusion, "we must make our own independent appraisal by reviewing the law and applying it to the facts of the case." *Piper v. Layman*, 125 Md. App. 745, 754, 726 A.2d 887 (1999).

*C.M. v. J.M.*, 258 Md. App. 40, 58 (2023).

## DISCUSSION

## I.

## Whether the Circuit Court Appropriately Granted a Final Protective Order

### A. *Husband's Contentions*[4]

Husband argues that the final protective order is impermissible because Appellant's claims were precluded by the doctrines of *res judicata* and collateral estoppel. Husband contends that Wife already litigated the same issues and presented the same claims in her original hearing on June 14, 2023, in front of the District Court of Maryland, which ultimately denied Wife's petition for a final protective order. He claims that the only reference of abuse that occurred after the June hearing was Wife's testimony that Husband threatened to kill her. Husband argues that there was no "[a]ssault in any degree [o]n 6/14/23" and no evidence of "serious bodily harm" that occurred *after* June 14, 2023. Thus, Husband contends that the trial court erred by re-hearing past-litigated issues and using the knowledge gained from re-hearing these issues to support the finding for a final order of protection.

---

[4] Wife, who is proceeding *pro se*, did not file a brief. Thus, we are limited to Husband's arguments and the record. We note that in his brief, Husband makes a single fleeting reference to "alleged violations of procedural due process under Article 24 of the Maryland Declaration of Rights and the Fourteenth Amendment to the United States Constitution." Husband does not support this reference with any argument, nor does he identify what actions or non-actions violated his procedural due process. We will not speculate upon what Husband's arguments are. *Anderson v. Litzenberg*, 115 Md. App. 549, 578 (1997) (A party's failure to provide legal support for an argument on appeal, constitutes a waiver of that argument.).

Finally, Husband argues that the trial court's "credibility assessment" was tainted by "the inappropriate findings of 'past abuse.'"

### *B. Legal Framework*

The purpose of title 4, subsection 5 of the Family Law Article—which governs domestic violence—is "'to protect and aid victims of domestic abuse by providing . . . immediate and effective remed[ies]' wide in variety and scope to 'avoid future abuse.'" *C.M. v. J.M.*, 258 Md. App. 40, 56 (2023) (alteration in original) (quoting *Katsenelenbogen v. Katsenelenbogen*, 365 Md. 122, 134 (2001)). The "primary goals of the statute are preventative, protective and remedial, not punitive." *Id.* (quoting *Katsenelenbogen*, 365 Md. at 134). Indeed, the statute was intended not to "punish[] . . . past conduct" but to "prevent further harm to the victim." *Coburn v. Coburn*, 342 Md. 244, 252 (1996).

"A petitioner may seek relief from abuse by filing with a court . . . a petition that alleges abuse of any person eligible for relief by the respondent." FL § 4–504(a)(1). The statute defines a "[p]erson eligible for relief" to include "a person related to the respondent by blood, marriage, or adoption[.]" FL § 4-501(m)(3). A trial court may grant a final protective order if there is a finding "by a preponderance of the evidence that the alleged abuse has occurred[.]" FL § 4-506(c)(1)(ii). Preponderance of the evidence means "more likely than not[.]" *C.M.*, 258 Md. App. at 56-57 (quoting *State v. Sample*, 468 Md. 560, 598 (2020)). As is pertinent to this case, the Family Law Article defines "[a]buse" as: "an act that places a person eligible for relief in fear of imminent serious bodily harm[.]" FL § 4-501(b)(1)(ii).

16

In assessing the credibility of the witnesses who testify at a final protective order hearing, the circuit court is "entitled to accept—or reject—*all*, *part*, or *none* of" their testimony, "whether that testimony was or was not contradicted or corroborated by any other evidence." *Omayaka v. Omayaka*, 417 Md. 643, 659 (2011) (emphasis in original). It is "not our role, as an appellate court, to second-guess the trial judge's assessment of a witness's credibility." *Gizzo v. Gerstman*, 245 Md. App. 168, 203 (2020).

In reviewing instances of abuse in the context of a protective order, the proper standard for a circuit court is "an individualized objective one—one that looks at the situation in the light of the circumstances as would be perceived by a reasonable person in the petitioner's position." *Katsenelenbogen v. Katsenelenbogen*, 365 Md. 122, 138 (2001). This is because "[a] person who has been subjected to the kind of abuse defined in § 4-501(b) may well be sensitive to non-verbal signals or code words that have proved threatening in the past to that victim but which someone else, not having that experience, would not perceive to be threatening." *Id.* at 139.

The *Katsenelenbogen* Court elaborated:

[A] belief as to imminent danger "is necessarily founded upon the defendant's sensory and ideational perception of the situation that he or she confronts, often shaded by knowledge or perceptions of ancillary or antecedent events." [*State v. Marr*, 362 Md. 467, 481.] The issue, we said [in *Marr*], was not whether those perceptions were right or wrong, but whether a reasonable person with that background could perceive the situation in the same way.

We believe that to be the proper test to be applied in this context as well. **A person who has been subjected to the kind of abuse defined in [FL] § 4-501(b) may well be sensitive to non-verbal signs or code words that have proved threatening in the past to that victim but which someone else, not having that experience, would not perceive to be threatening.** The

17

reasonableness of an asserted fear emanating from that kind of conduct or communication must be viewed from the perspective of the particular victim. Any special vulnerability or dependence by the victim, by virtue of physical, mental, or emotional condition or impairment, also must be taken into account.

*Katsenelenbogen*, 365 Md. at 139 (emphasis added).

The Supreme Court of Maryland articulated the prospective nature of the domestic violence statute in *Coburn v. Coburn*, 342 Md. 244 (1996) and acknowledged the predictive value of prior spousal abuse. Marcia Coburn, acting *pro se*, filed a petition for protection against her husband, William Coburn. *Id.* at 248. In the petition, Ms. Coburn alleged that her husband "slapped, punched, and threatened Ms. Coburn" a month earlier. *Id.* She also noted that Mr. Coburn had physically abused and harassed her during the previous year. *Id.* The District Court of Maryland granted a temporary *ex parte* order of protection and scheduled a hearing for the final order of protection. *Id.* During the hearing, the court found that Mr. Coburn "shoved Ms. Coburn against a car, hit her in the face open-handed, chased her, and then punched her in the back of her head." *Id.* The court issued a final protective order, Mr. Coburn appealed, and the Supreme Court of Maryland granted certiorari. *Id.* at 248-49.

The Supreme Court traced the legislative history of the domestic violence statute and observed that "[t]he legislature did not design the statute as punishment for past conduct; it was instead intended to prevent further harm to the victim." *Id.* at 252. In construing the statute, the Court determined that "the legislature recognized the importance of evidence of a pattern of abuse in determining the need for protection against future abuse." *Id.* at 257. The Court further explained:

18

[E]xcluding evidence of past abuse would violate the fundamental purpose of the statute, which is to prevent future abuse. The statute was not intended to be punitive. Its primary aim is to protect victims, not punish abusers. Whether a respondent has previously abused a petitioner is important and probative evidence in determining the appropriate remedies. Protective orders are based on the premise that a person who has abused before is likely to do so again, and the state should offer the victim protection from further violence.

*Id.* at 258-59.

The *Coburn* Court also observed that allegations of prior abuse assist the judge in "determining appropriate remedies." *Id.* at 257-58. For example, "[d]ifferent remedies are required when there has been an isolated act of abuse that is unlikely to recur, as compared to an egregious act of abuse preceded by a pattern of abuse." *Id.* at 258. The Court noted that, although not raised by Ms. Coburn, evidence of past abuse may be admissible under Maryland Rule of Evidence 5-405(b), when "character . . . is an essential element of a charge, claim, or defense" and the case may be proved by "relevant specific instances of that person's conduct."[5] *Id.* at 260.

*Res Judicata and Collateral Estoppel*

Whether collateral estoppel or *res judicata* applies to preclude relitigating an issue is a question of law, which we review *de novo*. *Bank of N.Y. Mellon v. Georg*, 456 Md. 616, 666 (2017) ("We review without deference, however, questions of law, such as a

---

[5] *See* Md. Rule 5-405(b):

> (b) Specific Instances of Conduct. In cases in which character or a trait of character of a person is an essential element of a change, claim, or defense, proof may also be made of relevant specific instances of that person's conduct.

19

determination as to the applicability of the doctrines of res judicata and collateral estoppel.").

The doctrines of *res judicata* and collateral estoppel are "related . . . [but] apply in different circumstances and . . . prevent different things." *Colandrea v. Wilde Lake Community Ass'n, Inc.*, 361 Md. 371, 390 (2000) (quoting *Klein v. Whitehead*, 40 Md. App. 1, 12, *cert. denied*, 283 Md. 734 (1978)) (quotation marks omitted). Under the doctrine of collateral estoppel, an *issue* cannot be re-litigated when: (1) the issue decided in the prior adjudication is identical with the one presented in the action in question; (2) there is a final judgment on the merits; (3) the party against whom the doctrine is asserted is a party or in privity with a party to the prior adjudication; and (4) the party against whom the doctrine is asserted was given a fair opportunity to be heard on the issue. *Garrity v. Md. State Bd. of Plumbing*, 447 Md. 359, 369 (2016) (quoting *Colandrea v. Wilde Lake Cmty. Ass'n, Inc.*, 361 Md. 371, 391 (2000)). "If a proceeding between parties does not involve the same cause of action as a previous proceeding between the same parties, the principle of collateral estoppel applies, and only those facts or issues actually litigated in the previous action are conclusive in the subsequent proceeding." *Colandrea*, 361 Md. at 388.

Under Maryland law, *res judicata* precludes a party from relitigating a *claim* when: "(1) the parties in the present litigation are the same or in privity with the parties to the earlier action; (2) the claim in the current action is identical to the one determined in the prior adjudication; and (3) there was a final judgment on the merits in the previous action." *Powell v. Breslin*, 430 Md. 52, 63-64 (2013).

20

"Collateral estoppel is concerned with the issue implications of the earlier litigation of a different case, while *res judicata* is concerned with the legal consequences of a judgment entered earlier in the same cause." *Colandrea v. Wilde Lake Community Ass'n, Inc.*, 361 Md. 371, 390–91 (2000) (citation omitted).

### C. Analysis

Husband's argument that the circuit court was barred by the doctrines of *res judicata* and collateral estoppel from entering the underlying protective order is without merit. The court was not barred under the doctrine of *res judicata* because, although Husband and Wife were the same parties in the June 14, 2023 and the July 20, 2023 hearings for final protective orders, Wife's second petition for a final protective order constituted a different cause of action. The issues of abuse raised during those proceedings were not identical because Wife raised a new allegation that, after the June 14 hearing, Husband threatened to kill her. As we noted, *supra*, abuse is "an act that places a person eligible for relief in fear of imminent serious bodily harm[.]" FL § 4-501(b)(1)(ii).

For the same reason, the doctrine of collateral estoppel did not preclude Wife from litigating the allegations of abuse during the final protective order hearing on July 20, 2023. The threat to kill Wife constituted a new allegation of abuse, as did the allegations that since June 14, Husband killed the parties' kittens to upset and scare Wife, and placed hidden cameras throughout the house and filmed Wife without her knowledge or consent.

We disagree with Husband's argument that Wife "refil[ed] the same petition for a protective order until the desired results [were] obtained." Husband's argument is based

21

on the incorrect premise that the trial court was precluded from considering Wife's allegations of past abuse by Husband against her. As explained above, "excluding evidence of past abuse would violate the fundamental purpose" of the domestic violence statute, "which is to prevent future abuse." *Coburn*, 342 Md. at 258. "Whether a respondent has previously abused a petitioner is important and probative evidence in determining the appropriate remedies." *Id.* at 259.

The circuit court in this case found that after the prior petition for final protective order was denied, Husband made a "credible threat" that placed Wife "in fear of imminent bodily injury." *See* FL § 4-501(b)(1)(ii). We defer to the judge's credibility determinations, finding Wife's testimony credible, and finding the testimony of Rimma Shiptsova, for example, "not [] at all credible[.]" *C.M.*, 258 Md. App. at 58 (citing *Barton*, 137 Md. App. at 21; and *Gizzo*, 245 Md. App. at 203). The judge found Husband's "testimony that he had never threatened to kill [Wife] and that he had never hurt or hit her" not credible.

The record supports the judge's determination that there were instances of past abuse. The court explained—looking at the pictures taken at the hospital—"these are not bruises that you get by falling down." The judge observed that "they're clearly grab marks on her arms exactly where she said the respondent grabbed her[.]" The court ruled out the possibility that the bruises were self-inflicted, observing that she did not "even know how [Wife] could do that to herself based on the angle[.]"

The trial judge, most aptly situated to determine the credibility of witnesses, was entitled "to accept—or reject—*all*, *part*, or *none* of the testimony of any witness, whether

22

that testimony was or was not contradicted or corroborated by any other evidence." *Omayaka v. Omayaka*, 417 Md. 643, 659 (2011) (emphasis in original). We see nothing erroneous in the trial court's acceptance of Wife's testimony in the Court's finding that Wife proved her allegations of abuse and fear for her safety by a preponderance of the evidence.

For the foregoing reasons, we hold the trial court did not err or abuse its discretion in granting Wife a final protective order against Husband.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**